Introduction
The plaintiffs, Shelia Holly and Leroy Holly, parents of Cameron Holly, appeal the judgment on the jury verdict in favor of the defendants Huntsville Hospital and Dr. John Edward Markushewski, Jr., in the medical malpractice action of the plaintiffs. We reverse and remand.
On October 6, 1997, Shelia Holly took her eleven-month-old son Cameron to the emergency room at Huntsville Hospital because he had a high fever, a high pulse rate, and trouble breathing. Dr. Markushewski, who was board-certified in family practice, was working in the emergency room when the Hollys arrived at the hospital. Dr. Markushewski treated Cameron for croup, observed him for three hours, gave Shelia a prescription for Cameron, and then released him to go home. After Shelia left the hospital, she went to a Winn *Page 1179 
Dixie pharmacy to get Cameron's prescription filled. While at the pharmacy, Cameron went into respiratory arrest and then into cardiac arrest. Emergency medical technicians, responding to a 911 emergency call, transported Cameron to Huntsville Hospital, where he was pronounced dead. An autopsy of Cameron indicated that he died of necrotizing tracheobronchitis (severe tracheitis and bronchitis), a severe infection of the trachea and bronchi that obstructed his airway.
The plaintiffs sued Huntsville Hospital and Dr. Markushewski for medical malpractice. To prove medical negligence, the plaintiffs offered expert medical testimony by Dr. Mark Weber, who was board-certified in pediatrics, in emergency medicine, and in pediatric emergency medicine, and Dr. Lance Kreplick, who was board-certified in emergency medicine. The defendants objected to expert testimony from Dr. Weber and Dr. Kreplick on the ground that they were not "similarly situated" with Dr. Markushewski in that neither Dr. Weber nor Dr. Kreplick was board-certified in family practice as Dr. Markushewski was.
Relying on Waddail v. Roberts, 827 So.2d 784 (Ala.Civ.App. 2000) (reversed by this Court six months after the trial of the case now before us, Ex parte Waddail, 827 So.2d 789 (Ala. 2001)), the trial court held that, because Dr. Weber and Dr. Kreplick were not board-certified in family practice like the defendant Dr. Markushewski, they were not "similarly situated" with Dr. Markushewski and therefore were not competent to testify to the standard of care and the breach of that standard alleged by the plaintiffs. While the trial court allowed Dr. Weber and Dr. Kreplick to testify to causation, the trial court instructed the jury that these expert witnesses were not qualified to testify to the standard of care or to a breach of that standard. Further relying on Waddail v. Roberts, the trial court also instructed the jury that the standard of care applicable to Dr. Markushewski was the standard of care applicable to family practice physicians.
The jury returned a verdict in favor of the defendants. The plaintiffs moved for a new trial. The trial court denied the motion and entered a judgment on the jury verdict in favor of the defendants.
On appeal, the plaintiffs argue that Waddail v. Roberts, followed by the trial court in excluding testimony by the plaintiffs' expert witnesses on standard of care and breach of that standard, and cited by the trial court in instructing the jury on the competency of the plaintiffs' expert witnesses and on the standard of care applicable to the defendant doctor, was wrongly decided. The plaintiffs argue to us, as they did before the trial court, that the standard of care applicable to the defendant doctor was the standard applicable to a doctor practicingemergency medicine, as the defendant Dr. Markushewski was in treating Cameron. The plaintiffs argue, therefore, that the trial court erred to reversal in excluding the plaintiffs' experts' testimony to standard of care and breach of that standard and in instructing the jury on the plaintiffs' experts' competency and on the applicable standard of care. The defendants argue that any error by the trial court was harmless because "Dr. Markushewski himself provided the same testimony the plaintiffs' experts would have provided concerning the standard of care, and this testimony was sufficient to establish a jury question whether Dr. Markushewski breached the standard of care." (Appellees' brief, p. 7.)
 Testimony
In the plaintiffs' case-in-chief, they called the defendant Dr. Markushewski as an adverse witness. On direct examination, *Page 1180 
he testified that he was board-certified in family practice but was not board-certified in emergency medicine. He testified further that, when he treated Cameron, he was "working in the emergency room practicing emergency medicine" and was "not [working] as a family practice doctor." (R. 10.) Dr. Markushewski admitted that he had not obtained a complete history of Cameron's illness, had treated him for croup rather than for necrotizing tracheobronchitis, had not admitted him to the hospital, had not intubated him to protect his airway, and had not recorded his vital signs before discharging him. Dr. Markushewski further admitted that tracheitis, a part of tracheobronchitis, requires admission to the hospital and intubation of the patient to protect his airway.
On cross-examination by defense counsel, Dr. Markushewski testified about the standard of care to be met by a doctor practicing emergency medicine:
 "Q. Tell me what the standard of care is, Doctor, as you understand it?
 "A. Standard of care, as I understand it, is that the standard of care implies what a reasonable and prudent physician would do to evaluate and treat a patient who presents to the emergency department.
". . . .
 "Q. Let's talk about Cameron Holly for a minute. Does the standard of care with Cameron Holly require you to take a history from his mother about his illness?
"A. Yes, sir.
"Q. And did you do that?
"A. I did.
 "Q. And did you take the appropriate history that met the standard of care?
"A. Yes, sir.
"Q. Did it require that you do a physical examination?
"A. Yes, sir.
"Q. And did you do that physical examination?
"A. I did.
 "Q. And did you do a thorough and appropriate physical examination for his presentation?
"A. Yes, sir.
". . . .
 "Q. Now, let me talk to you about the literature and your course of action here. I want to show you some information from a publication, Pediatrics in Review, December 1997. One of the sections in here deals with croup and its treatment; am I correct?
"A. Yes, sir.
"Q. You've reviewed that?
"A. Yes, sir.
 "Q. You consider that to be an authoritative — or reliable authoritative information with respect to the treatment of croup?
"A. Yes, sir.
 "Q. `Current research suggests that children presenting with croup who are in significant distress may be treated effectively with racemic epinephrine or L-epinephrine and steroids, undergo a period of observation, and be discharged home safely if they are free of stridor and retraction and have access to appropriate follow-up care. The recommended period of observation varies from one to three hours.' Do you agree that is appropriate and acceptable care to be provided to an infant such as Cameron Holly?
"A. Yes, sir. *Page 1181 
 "Q. Would it represent one method of treatment of a patient such as Cameron that would meet the appropriate standard of care for someone taking care of a patient such as Cameron Holly?
"A. Yes, sir.
"Q. In this case, did he receive racemic epinephrine?
"A. Yes, sir.
"Q. Steroids?
"A. Yes, sir.
 "Q. We haven't talked about that. He got the two shots, one was an antibiotic Rocephin?
"A. Right.
"Q. The other was Decadron, the steroid?
"A. That's correct.
"Q. So, he had received both epinephrine and steroid?
"A. Right. Yes, sir.
 "Q. He had undergone a period of observation that was approximately three hours?
"A. Yes, sir.
"Q. He was free of stridor, correct?
"A. Yes, sir.
"Q. He was free of reactions?
"A. Yes, sir.
"Q. Did he have access to appropriate follow-up care?
"A. Yes, sir.
"Q. Had you arranged for that follow-up care the next day?
"A. Yes, sir.
". . . .
 "Q. Let me see if I can find this other one. Let me show you an article from the — I believe it's Mayo Clinic — the Mayo Clinic Procedures I believe is the publication of the Mayo Clinic here. And ask you if you have reviewed that.
"A. I have.
 "Q. And does it contain information that is pertinent to the treatment of a patient like Cameron Holly?
"A. Yes, sir.
 "Q. And does it make a recommendation for treatment of a patient like Cameron Holly?
"A. Yes, sir.
 "Q. They note, `It seems to be safe to dismiss a child who received nebulized adrenaline.' Is that racemic epinephrine?
"A. Yes, sir.
 "Q. From the emergency department, if, after three to four hours of observation, the child has not stridor at rest, normal air entry, normal color, normal level of consciousness, and has received one dose of .6 milligrams per kilogram of dexamethasone. Is that Decadron?
"A. Yes, sir.
"Q. Same as what [Cameron] received?
"A. Yes, sir.
". . . .
"Q. And, he received that treatment?
"A. Yes, sir.
 "Q. Lastly, have you reviewed an article on `The Cost Effective Use of Nebulized Racemic Epinephrine'?
"A. Yes, sir.
 "Q. This one here — `In the treatment of Croup' from the American Journal of Emergency Medicine, January 1998?
"A. Yes, sir.
 "Q. Does it contain reliable information, reliable authority for the treatment of patients such as Cameron Holly?
"A. Yes, sir. *Page 1182 
 "Q. Does it provide that if there is significant improvement after treatment with racemic epinephrine, patient should be observed for three hours in the E.D. [emergency department] until the effect of the medication is gone to assess for relapse of the stridor respiratory distress. If continued improvement, therapy may include discharge on appropriate therapy and close follow-up.
"A. Yes, sir.
 "Q. Was that, too, in keeping with the standard of care that was being advised for patients being treated as was Cameron Holly?
"A. Yes, sir.
"Q. And did you follow that?
 "A. Yes, sir. He stayed in the E.D. [emergency department] for approximately three hours after the completion of racemic epinephrine treatment.
". . . .
 "Q. Let me close with a couple of questions. In the care that you provided to Cameron that day, that morning and that early afternoon during that four hours that he was there in the emergency department at Huntsville Hospital, did you bring to him your education, your experience, and did you do what you thought was in his best interests for his presentation?
"A. In my medical judgment I did, yes, sir.
 "Q. And did you follow those teachings and that training that you had and these things such as we've just alluded to from the medical literature that set forth plans for care for patients such as Cameron Holly as you rendered care to him that day?
"A. Yes, sir.
 "Q. Did you perform in a manner which is in keeping with the standard of care required of you as a doctor practicing in the emergency department at the time in question of October 6, 1997?
"A. Yes, sir.
 "Q. Did you in any way violate what was the standard of care required of you in taking care of Cameron Holly on October 6, 1997?
"A. No, sir."
(R. 223-232.)
Thereafter, on redirect examination by counsel for the plaintiff, Dr. Markushewski testified further:
 "Q. . . . If someone has a severe case of viral tracheitis, you agree that the standard of care requires all of these things?
 "A. If someone has a severe case of viral tracheitis, that would — as we talked about earlier, Cameron did not have that.
 "Q. I understand you say that is correct, but if that were the truth, then you agree that the standard of care requires mandatory admission to the hospital, aggressive treatment, safe airway, all three of those things, right?
"A. That's correct."
(R. 232.)
Expert witness Dr. Weber testified that he had been board-certified in pediatrics, emergency medicine, and pediatric emergency medicine. He testified that he treats his own and other pediatric patients in the emergency room and that, when he is on call for the pediatric emergency department, he answers calls from other emergency room physicians about their pediatric patients. Dr. Weber testified he *Page 1183 
has practiced emergency medicine in this manner for several years, including the year before the alleged breach occurred. Had Dr. Weber been permitted to testify about the standard of care and the breach of that standard alleged by the plaintiffs, he would have testified as follows:
 "Q. Dr. Weber, are you familiar with the minimum standard of care required of a physician seeing a pediatric patient like Cameron Holly in an emergency room setting in October of 1997?
"A. Yes.
 "Q. On the basis of your medical education, background, and training and experience, your review of the records in this case, do you have an opinion as to whether Dr. Markushewski met and satisfied the standard of care in this case?
"A. Yes.
"Q. What is that opinion?
"A. That he did not.
 "Q. In what respects did Dr. Markushewski deviate or depart from the minimum standard of care applicable to the facts of this case?
 "A. That if a diagnosis of tracheitis, be it bacterial or viral, is seriously entertained or made, there is only one management option for that patient, and that patient goes to the operating room, they have an artificial airway placed, and they're treated with antibiotics.
 "Q. All right. In your opinion, did the standard of care require Dr. Markushewski to see that that was done in this case?
"A. Yes.
 "Q. If the standard of care had been met in this case, Dr. Weber, do you have an opinion based on reasonable medical probability as to whether Cameron Holly would probably have survived?
"A. Yes.
"Q. What is that opinion?
"A. That he would have survived.
"Q. What do you base that opinion on?
 "A. I base that opinion on two facts: One, if you have either severe croup or tracheitis, or for that matter epiglottitis, if those patients are timely taken, in the case of severe croup, to an intensive care unit and have frequent, rapid cardiopulmonary assessments so that you recognize when that child is tiring out, their airway can be managed appropriately. Certainly, if you have a patient with epiglottitis or tracheitis, if those patients are taken — if those patients are taken to the operating room and their airway is managed appropriately, they do very well. And, in fact, for the most part are extubated within 48 or 72 hours. . . .
"Q. All right.
 "A. And then the second area is if they're admitted in the case of severe croup, certainly in a pediatric intensive care unit setting, which this hospital had and if there was a pediatric intensivist available — from what I can gather from the records, Dr. McDuffey, she was available — that that airway would have been managed quite optimally.
 "Q. All right. And that Cameron Holly would have survived even if he had had a respiratory arrest before his airway was protected?
"A. Yes.
 "Q. You say the standard of care would require protection of the airway, admission to the hospital before *Page 1184 
Cameron arrested outside the hospital 45 to 50 minutes after he was discharged?
"A. That's correct."
(R. 284-87.)
The plaintiffs' other expert witness, Dr. Kreplick, testified by affidavit that he "became board certified in emergency medicine in 1994, and [he has] been actively engaged in the practice of emergency medicine continuously and without interruption since 1991." He testified further by this affidavit that the defendant Dr. Markushewski "breached the minimum standard of care" "required of emergency room physicians in diagnosing and treating children like Cameron Holly" by "[n]egligently discharg[ing]" him, "[n]egligently fail[ing] to stabilize and treat" him, "negligently fail[ing] to arrange for [him] to be admitted to the hospital," and "[n]egligently fail[ing] to appreciate the severity and seriousness of [his] condition."
The trial court did allow Dr. Weber and Dr. Kreplick to answer hypothetical questions limited to the issue of causation in testimony admitted into evidence before the jury. Both testified to the jury that, if Cameron Holly had been "admitted to the hospital [and] aggressively treated with regard to a diagnosis of tracheitis, and [if] steps [had been] taken to protect his airway," he would have survived. (R. 330, 416.) While the evidence established that Cameron had not been so treated by the defendant Dr. Markushewski, neither plaintiffs' expert was allowed to testify that these omissions constituted a breach of the applicable standard of care.
 Law A. Alabama Medical Liability Act
Section 6-5-548(a), Ala. Code 1975, a part of the Alabama Medical Liability Act, provides:
 "(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." (Emphasis added.)
Section 6-5-548(b), applicable to defendant health care providers who are not specialists, provides:
 "(b) . . . [A] `similarly situated health care provider' is one who meets all of the following qualifications:
 "(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
 "(2) Is trained and experienced in the same discipline or school of practice.
 "(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."
Section 6-5-548(c), applicable to defendant health care providers who are specialists, provides:
 "(c) . . . [A] `similarly situated health care provider' is one who meets all of the following requirements:
 "(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same speciality.
 "(3) Is certified by an appropriate American board in the same specialty.
 "(4) Has practiced in this speciality during the year preceding the date *Page 1185 
that the alleged breach of the standard of care occurred."
Section 6-5-548(e) governs the competency of expert witnesses to testify to breach of the standard of care in medical malpractice actions:
 "(e) The purpose of this section is to establish a relative standard of care for heath care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a 'similarly situated health care provider' as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty."
(Emphasis added.)
 B. Waddail v. Roberts
In Waddail v. Roberts, the plaintiff alleged that the defendant doctor, who was certified by the American Osteopathic Board of Family Physicians, had breached the standard of care applicable to a doctor practicing emergency medicine, which required the doctor to stabilize a diabetic patient before the doctor transferred the patient to another facility. To prove medical negligence, the plaintiff offered expert testimony by a doctor who was certified by the American College of Emergency Medicine. The trial court granted the defendant's motion for a summary judgment; the plaintiff appealed the summary judgment to this Court; and this Court transferred the appeal to the Court of Civil Appeals pursuant to § 12-2-7(6), Ala. Code 1975.
The Court of Civil Appeals acknowledged that "the medical negligence alleged in this case would have occurred during the practice of emergency medicine." 827 So.2d at 788. Even though the defendant doctor was not board-certified in emergency medicine, the Court of Civil Appeals treated him as a specialist and applied § 6-5-548(c) to determine whether the proffered expert witness was "similarly situated" and therefore competent to testify under § 6-5-548(e). The Court of Civil Appeals "conclude[d] that, because [the defendant doctor and the proffered witness] were certified by different boards, [the proffered witness could not] testify as to the standard of care to which [the defendant doctor] is to be held . . . ." 827 So.2d at 788.
 C. Ex parte Waddail
Reversing the judgment of the Court of Civil Appeals, this Court, in Exparte Waddail, held that the Court of Civil Appeals had erred in applying subsection (c) and the last sentence of subsection (e) of § 6-5-548
in the Alabama Medical Liability Act to determine whether the proffered expert witness was competent to testify against the defendant doctor on the issue of medical negligence.
 "[The defendant doctor] is board-certified in family medicine; however, the alleged breach of the standard of care occurred while he was practicing emergency medicine. In Medlin [v. Crosby, 583 So.2d 1290 (Ala. 1991)], this Court held that for the purposes of determining whether a defendant doctor is a `specialist' under subsection (c), `the trial court should look to whether the *Page 1186 
defendant "health care provider" is board-certified in the speciality or discipline or school of practice that covers the area of the alleged breach.' 583 So.2d at 1294 (emphasis added [in Ex parte Waddail]). [The defendant doctor], who is not board-certified in emergency medicine, . . . is not a specialist.'" (Footnote omitted.)
Ex parte Waddail, 827 So.2d at 793. In other words, we held that a defendant board-certified health-care provider practicing outside his speciality in undertaking the allegedly negligent treatment is not a "specialist" protected by the more stringent qualifications imposed by subsection (c) (as compared with subsection (b)) of § 6-5-548 for adverse expert witnesses. We held further that the disqualification of any proffered adverse expert witness not "certified by the same American board in the same specialty" imposed by the "last sentence of subsection (e) [of § 6-5-548] applies only to cases involving specialists." 827 So.2d at 794.
We held that, because the defendant doctor had been practicing outside his speciality in committing the alleged medical negligence, he was not a "specialist" in the case then before us. We held that, because the defendant doctor was not a specialist, subsection (b) rather than subsection (c) of § 6-5-548 applied to determine whether the proffered expert witness qualified as "similarly situated" with the defendant. We concluded that the proffered expert witness met the qualifications of a "similarly situated health care provider" specified by § 6-5-548(b), which did not require board certification in the same specialty as the defendant's, and therefore met the applicable criterion for competency to testify imposed by § 6-5-548(e).
 Analysis
In reaching our conclusion in Ex parte Waddail, we recognized the three questions formulated in Medlin v. Crosby, 583 So.2d 1290 (Ala. 1991), for determining whether a proffered expert witness qualifies as a "similarly situated health care provider" within the meaning of the Alabama Medical Liability Act:
 "(1) What is the standard of care alleged to have been breached? (2) Is the defendant `health care provider' a specialist in the discipline or school of practice of the standard of care that the court has previously determined is alleged to have been breached? (3) Does the proffered expert witness qualify as a `similarly situated health care provider' under the subsection determined in the second step to apply?"
Medlin, 583 So.2d at 1293, and Ex parte Waddail, 827 So.2d at 793. Therefore, in the case now before us, we will answer the same three questions to determine whether the plaintiffs' experts Dr. Weber and Dr. Kreplick are "similarly situated" with the defendant Dr. Markushewski and therefore competent to testify against him.
The defendants do not dispute that "the standard of care alleged to have been breached" was the standard of care applicable to doctors practicing emergency medicine. Likewise, the defendants do not dispute that "the defendant `health care provider' [was not] a specialist" in emergency medicine. Because the defendant doctor was not "a specialist in the discipline or school of practice" subject to "the standard of care alleged to have been breached," § 6-5-548(b) governs the issue of whether the plaintiffs' experts Dr. Weber and Dr. Kreplick are "similarly situated" with the defendant doctor and therefore competent to testify against him. Medlin, supra, and Ex parte Waddail, supra. The record contains virtually uncontradicted evidence that both plaintiffs' experts meet all three "qualifications" specified § 6-5-548(b) — the *Page 1187 
requirements of (1) the appropriate license, (2) the training and experience "in the same discipline or school of practice" as the defendant's discipline or school of practice (emergency medicine) in his treatment of Cameron, and (3) the actual practice in that "same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred." The trial court did not find, and the defendants do not argue before us, any absence of any of these three § 6-5-548(b) qualifications in either of the plaintiffs' two expert witnesses. Therefore, they are "similarly situated" with the defendant doctor under § 6-5-548(b) and are not disqualified from testifying by the last sentence of § 6-5-548(e). Ex parteWaddail, supra. Thus, the trial court erred in excluding the testimony of the plaintiffs' expert witnesses Dr. Weber and Dr. Kreplick.
For virtually the same reasons, we hold that the trial court erred in instructing the jury that the plaintiffs' experts were not qualified to testify to standard of care and breach of that standard. Likewise, we hold that the trial court erred in instructing the jury that the standard of care applicable to the defendant doctor was the standard of care applicable to family practice physicians as distinguished from physicians practicing emergency medicine.
The defendants argue that any error by the trial court was harmless. In brief they write:
 "Because the jury was presented with expert testimony sufficient to support a verdict for the plaintiffs, and the testimony of the plaintiffs' experts as to the standard of care would have been cumulative, the jury's verdict cannot properly be set aside simply because the experts were not allowed to testify on that issue. The same is true of the alleged error in instructing the jury that the applicable standard of care was that of a `family practice physician.' Like the alleged error in excluding the experts' testimony on the standard of care issue, the alleged error in instructing the jury not only had to be erroneous, but also prejudicial."
(Appellees' brief, p. 9.) Essentially, the defendants are arguing that the plaintiffs' proof of a prima facie case renders harmless all of the errors committed against them.
 "'[T]he trial judge's refusal to permit certain witnesses to testify will constitute reversible error if those witnesses are produced to give testimony which goes to settle an ultimate issue in the case and which is different from the testimony given by the witnesses who have already testified.'
 "C. Gamble, McElroy's Alabama Evidence § 10.06 at 34 (5th ed. 1996).
 "'The integrity of our judicial system should be maintained by giving litigants a fair and just trial. The outcome may be the same, but the parties should be given an opportunity to present their evidence. Otherwise, the public's respect for and trust in our judicial system cannot be maintained.'
 "Morrison v. Morrison, 628 So.2d 839, 841-42 (Ala.Civ.App. 1993) (Robertson, P.J., dissenting)."
State ex rel. Pryor v. Cupps, 770 So.2d 1111, 1112 (Ala.Civ.App. 2000).
 "Under Alabama law, '"[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial."' King v. W.A. Brown Sons, Inc., 585 So.2d 10, 12 (Ala. 1991) (citation omitted). When an objection to a jury *Page 1188 
charge has been properly preserved for review on appeal, as this one was, we '"look to the entirety of the [jury] charge to see if there was reversible error,"' and reversal is warranted only if the error is prejudicial. King, 585 So.2d at 12.
". . . .
 ". . . The defendants were entitled to instructions that were germane to the legal theories for which there was substantial evidence. Therefore, the trial court's charge was prejudicial and constituted reversible error."
George H. Lanier Mem'l Hosp. v. Andrews, 809 So.2d 802, 806-07 (Ala. 2001). The only testimony the plaintiffs were allowed to introduce to prove the applicable standard of care and the defendant doctor's breach of that standard, and thereby to prove the ultimate fact of his medical negligence, consisted of his own admissions in response to the plaintiffs' questions addressing the individual elements of the standard of care and of a hypothetical breach. The defendant doctor, answering his own counsel's questions, however, testified positively that he did notbreach the standard of care. The testimony of the plaintiffs' proffered and qualified experts to the effect that the defendant doctor did breach the standard of care would have responded in like terms to the persuasive effect of the defendant doctor's own testimony to the contrary. Therefore, the exclusion of this competent expert testimony proffered by the plaintiffs "has probably injuriously affected [the] substantial rights of the [plaintiffs]." Rule 45, Ala.R.App.P. The erroneous jury instructions to the effect that the plaintiffs' experts were not qualified to testify to standard of care and breach can only have exacerbated the plaintiffs' prejudice by diminishing their experts' credibility on the one issue they were allowed to address: proximate causation. Finally, if the jury could deduce from the state of the evidence that the defendant doctor had breached the standard of care applicable to a doctor practicing emergency medicine, as the defendant doctor admittedly was, the jury can only have been bewildered, if not actually dissuaded from a verdict for the plaintiffs, by the instruction that the defendant doctor was subject to the standard of care applicable to family practice physicians.
 Conclusion
The trial court committed errors which probably injuriously affected the substantial rights of the plaintiffs. Therefore, they are entitled to a new trial. Rule 45, Ala.R.App.P. This judgment must be reversed and the cause remanded.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, HARWOOD, and WOODALL, JJ., concur.
MOORE, C.J., and STUART, J., concur in the result.