686 So.2d 224 (1996)
Paul N. JOHNSON
v.
ANDERSON FORD, INC., and Fred Jones Manufacturing Company.
1951476.
Supreme Court of Alabama.
December 6, 1996.
*225 A. Mark Ritter, Florence, for Appellant.
Michael J. Bernauer of Yates, Mitchell, Bernauer, Winborn & Morton, Florence, for Anderson Ford, Inc.
Patrick H. Graves, Jr., of Bradley, Arant, Rose & White, Huntsville, for Fred Jones Manufacturing Company.
HOUSTON, Justice.
The plaintiff, Paul N. Johnson, appeals from a summary judgment in favor of the defendants, Anderson Ford, Inc. ("Anderson"), and Fred Jones Manufacturing Company ("Jones"), in this action seeking to recover compensatory damages based on allegations of breach of implied and express warranties, negligence, and innocent misrepresentation. We affirm in part, reverse in part, and remand.
Johnson purchased from Anderson a new Ford F-250 diesel truck for personal and business use. The truck's engine later failed (as a result of a damaged piston), after the manufacturer's warranty had expired. Because the truck had been driven less than 100,000 miles when its engine failed, Johnson approached Gerald Morrison, Anderson's service manager, to see what assistance he could possibly get from the manufacturer. A representative of Ford Motor Company, the manufacturer, met with Johnson and Morrison and offered to sell Johnson a rebuilt diesel engine for $500 if Johnson would install it himself and agree to buy Ford products in the future. Johnson agreed.[1] As an *226 accommodation to Johnson and Ford, Anderson agreed to act as the intermediary through which the rebuilt engine would be acquired. In that role, Anderson (acting for Johnson) paid Jones for the rebuilt diesel engine. Because Jones rebuilds only gasoline engines, it had purchased the diesel engine from Dealer's Manufacturing Company ("Dealer's Manufacturing"), a Ford authorized remanufacturer. Dealer's Manufacturing had shipped the engine to Jones wrapped in plastic. Jones, which did not remove the wrapping, but did expressly warrant the engine "to be free from defects in material and workmanship performed by the factory," shipped it to Anderson. Anderson, without disturbing the wrapping, turned the engine over to Johnson, who had it installed in his truck by several of his employees.
Shortly after installing the engine in his truck, Johnson began to notice a tapping or a knocking noise coming from the engine. Johnson took the truck to Anderson, where Morrison told him that the engine was under warranty and that he should just continue to drive the truck until the noise could be more accurately located. The noise persisted and worsened. Johnson eventually left the truck at Anderson while he went on vacation. An Anderson service technician, John Benson, took the truck on a 10-minute test drive in an attempt to locate the problem. The engine failed while it was in Anderson's possession. A subsequent inspection of the engine by Johnson and others, including representatives of Anderson and Jones, revealed that one of the engine's pistons (the number seven piston) and the cylinder housing it had cracked. Another of the engine's pistons (the number five piston) was also damaged. A dispute later arose as to what had caused this damage. Johnson took the position that a defective oil control ring installed by the manufacturer had fractured and that pieces of that ring had gradually worked their way onto the top of the number seven piston and there had caused the piston to crack. On the other hand, Jones and Dealer's Manufacturing, although agreeing that the damage had in fact been caused by pieces of a piston ring working their way onto the top of the piston, disagreed as to how those pieces of piston ring had come to be in the engine. According to Jones and Dealer's Manufacturing, Johnson's employees had failed to properly clean the engine's intake manifold (which had remained with the truck and was not a part of the rebuilt engine) before installing the rebuilt engine. They believed that fragments *227 from a piston ring destroyed during the failure of the original engine had become embedded in a layer of old oil coating the inside of the intake manifold and that those fragments had worked loose and into the cylinder housing the number seven piston. Although it accepted no responsibility for the damaged engine, Jones, at Ford's request, offered to replace the engine with another rebuilt engine at no cost to Johnson. However, after failing to agree on a monetary settlement that would satisfy Johnson, Johnson filed this action.
Count one of Johnson's complaint alleged breach of implied warranties under Ala.Code 1975, §§ 7-2-314 and 7-2-315, with respect to both Anderson and Jones. Count two alleged that Jones had breached an express warranty. Count three alleged negligence on Anderson's part in driving the truck before dismantling the engine to inspect the pistons. Count four alleged innocent misrepresentation ("that said rebuilt motor was free from defects and/or was reasonably fit for its [intended] use") against both Anderson and Jones. Anderson and Jones filed separate motions for summary judgment, each motion supported by Johnson's deposition and various affidavits. Johnson responded to those motions with affidavits of his own. Citing various reasons, the trial court held that there was no genuine issue of material fact as to any of Johnson's claims and entered a judgment for both Anderson and Jones.
A summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. All reasonable doubts concerning the existence of a genuine issue of material fact must be resolved against the moving party. The applicable standard of review is the "substantial evidence rule." Ala.Code 1975, § 12-21-12. Thus, the trial court was obligated to view all of the evidentiary material offered by Anderson and Jones in support of their motions in the light most favorable to Johnson. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990).
The trial court properly entered the summary judgment as to count one. Section 7-2-314 provides, in pertinent part, that "[u]nless excluded or modified ..., a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Section 7-2-315 provides:
"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose."
The undisputed evidence indicates that neither Anderson nor Jones actually contracted with Johnson to sell him the rebuilt engine. Johnson's agreement was with Ford Motor Company. That agreement did call for Anderson to pay Jones for the engine, for Jones to ship the engine to Anderson, and then for Anderson to deliver the engine to Johnson. Johnson was to pay $500 to Anderson. However, as we understand the evidence, Anderson, as an accommodation to Ford and Johnson, was to act only as an intermediary through which Johnson could acquire the rebuilt engine from Ford.[2] Section *228 7-2-314 and § 7-2-315 both apply only to the "seller" of a product. In this case, Ford was the seller, not Anderson or Jones. See Wellcraft Marine v. Zarzour, 577 So.2d 414 (Ala.1990); see, also, Rhodes v. General Motors Corp., 621 So.2d 945 (Ala.1993). The privity of contract that arises out of the seller/buyer relationship was absent here. That absence, in cases of strictly economic harm (which is all Johnson alleged), is fatal to an implied warranty claim under either § 7-2-314 or § 7-2-315. Wellcraft Marine, supra; State Farm Fire & Casualty Co. v. J.B. Plastics, Inc., 505 So.2d 1223 (Ala.1987).
We cannot agree, however, that Jones was entitled to a judgment as a matter of law on count two (breach of express warranty). Citing Barré v. Gulf Shores Turf Supply, Inc., 547 So.2d 503 (Ala.1989), Jones contends that there was no contractual relationship (i.e., privity of contract) between it and Johnson and, therefore, that Johnson could not maintain an action on its express warranty. In the alternative, Jones contends that no reasonable person could infer that the rebuilt engine failed as a result of a defect in materials or workmanship.
As to Jones's first contention, we agree, as previously noted, that there was no seller/buyer relationship between Jones and Johnson. However, the express warranty on which Johnson based his claim was a manufacturer's warranty made by Jones directly to the ultimate purchaser, which was, in this case, Johnson. This distinguishes this case from Barré. In that case, the plaintiff, Barré, sought to maintain an action on an express extended warranty (covering repairs of a lawn mower) that had been given by the dealer to Thompson, who had originally purchased the mower and then had sold it to the plaintiff. This Court noted the general rules that a plaintiff must prove privity of contract in an action on an express warranty where only economic harm is involved and that the benefit of a warranty does not ordinarily run with a product on its resale so as to give the subsequent purchaser any right of action thereon as against the original seller. However, this Court stated:
"[Barré] may not maintain an action on an express warranty, where no injuries to natural persons are involved, even though [the dealer] had given the express warranty to [Barré's] vendor, Thompson.... The express warranty on the mower given to Thompson ... did not follow with the mower on its resale automatically. There is no evidence that [the dealer], through its agents, even knew that Barré was the owner of the mower or that he was anything other than an employee of Thompson ... on the occasions when he brought the mower in for repairs. There is no evidence that [the dealer] intended to extend the express warranties to him. Therefore, we find no basis for establishing privity of contract, and Barré's breach of warranty action must fail."
547 So.2d at 505. It is evident in the present case that Jones intended to extend the express warranty directly to the ultimate purchaserJohnson. There being privity of contract between Jones and Johnson, Johnson can maintain an action on the warranty.[3]
As to Jones's second contentionthat the summary judgment on the express warranty claim was proper on the ground that there was no evidence of a defect in the enginewe note that there is a sharp dispute in the evidence as to what exactly caused the piston to crack and the engine to fail. Jones presented compelling evidence, especially through the affidavit of Jim Garner, a master mechanic, indicating that the engine's failure could not have been caused by the migration of a fractured oil control ring up to the top of the piston. However, Johnson presented evidence of his own, specifically the affidavits of his employees, who testified that they had thoroughly cleaned the old intake manifold before installing the rebuilt engine, and the *229 affidavit of Lenice E. Holden,[4] which stated, in pertinent part, as follows:
"It is my opinion that the damage started with the piston ring, which was broken. The broken piston ring burned and broke the piston. There were pieces of the ring or steel embedded in the top of the piston. This opinion is based on the evidence presented to me at Horne Wrecker Service & Storage. I would like to note that the valves were missing out of the head. If I had had the opportunity to view the valves it might have proved with a higher degree of certainty what caused the damage. Based only on what I saw, it is my opinion that it was the broken ring in the rebuilt engine that caused the damage. I have seen rings broken during installation of the piston that caused the same results on several occasions."
Although we appreciate Jones's earnest attempt to "argue away" the evidence presented by Johnson, we cannot, based on this record and viewing the evidence in the light most favorable to Johnson, hold that no genuine issue of material fact exists as to what caused the engine to fail.
We also cannot agree that Anderson was entitled to a summary judgment on Johnson's negligence claim (count three). Johnson alleged in pertinent part as follows:
"Anderson Ford, Inc., undertook to examine said motor and to repair the same if necessary and while in their possession, the said Anderson Ford, Inc., operated and used said motor in a negligent manner and it was a[sic] proximate consequence of their said negligence said motor was caused to break and ... a piston cracked causing the motor to malfunction."
In support of its motion for summary judgment, Anderson submitted the affidavit of John Benson, an Anderson Ford service technician:
"In May of 1992, I was a service technician at Anderson Ford, Inc. At that time, I had 14 years' experience as a diesel mechanic.
"In May of 1992, I examined a 1990 Ford F-250 truck belonging to Paul Johnson. Mr. Johnson reported a knocking sound coming from the motor. In attempting to ascertain the cause of the knocking sound, I first checked the oil and engine coolant levels. I started the engine and heard a slight knocking sound which was coming from the right passenger side of the engine.
"To investigate further, it was necessary to test-drive the vehicle to be better able to pinpoint the engine problem. I drove the vehicle at city and highway speeds. The knocking sound became louder, and I noticed that the engine was not running smoothly. I immediately drove the vehicle back to Anderson Ford. The test drive lasted approximately ten minutes. I performed ordinary tests to ascertain the cause of the knocking sound in the engine; I only drove the vehicle in a manner necessary for these tests."
In response, Johnson submitted the affidavit of Edward Posey:
"I have been a mechanic for 40 years. During those years I rebuilt engines, installed factory rebuilt engines, along with doing other types of repairs to motor vehicles.
"During the time I have been a mechanic, I worked for Leery and Owens Machinery Company for approximately 13 years. When someone brought a vehicle in that had a knocking sound in the engine, we never test-drove the vehicle to find the problem. We would push it into the repair area and remove parts from the engine to identify the problem. We knew and know that an engine could be severely damaged if we started it and/or test-drove it. Based on the information given to me, that Anderson Ford knew that the engine was rebuilt and just installed, and that there was a knocking sound in the engine, they should never have test-drove that vehicle."
Johnson's negligence claim, as we understand it, is based on allegations that the *230 engine began to fail shortly after it was installed (i.e., Johnson contends that shortly after the engine was installed the allegedly defective oil control ring had broken and worked its way up onto the top of the piston, causing a tapping or knocking noise in the engine when the engine was running), but that the piston and the cylinder did not actually crack until the test drive by Benson. Thus, Johnson's claim is, apparently, that had Benson immediately dismantled the engine and inspected the pistons, without test-driving the truck, only minor repairs would have been necessary. Again, we must defer on this issue to the jury, which would have the duty to sort out the testimony of those persons having superior knowledge as to the mechanics of truck engines. We cannot hold, based on the evidence before us, that there is no genuine issue of material fact as to whether Anderson was negligent and, if it was negligent, whether that negligence was a proximate cause of the engine's failure.
As to count four (innocent misrepresentation), we hold that the summary judgment was proper. Johnson alleged that Anderson and Jones had misrepresented that the rebuilt engine was "free from defects and/or was reasonably fit for its [intended] use." Johnson argues as follows on page 14 of his original brief:
"Anderson Ford made material misrepresentations to the plaintiff as to the condition or the fitness of the remanufactured engine; [it] represented to the plaintiff that the remanufactured engine was `free from defects and/or ... was reasonably fit for its [intended] use.' And that the engine was under a 12,000-mile warranty (C.R.152). The complaint further alleges that these representations were either false or mistaken. When Johnson took the vehicle [to] Anderson Ford the day after the engine was installed and [Johnson] had found a problem with it, appellee Anderson Ford's representative told him not to worry about it, to drive the vehicle, that it was under warranty for 12,000 miles (C.R. 152)."
In his deposition at page 152 of the record (the only part of the record cited as evidence of a misrepresentation), Johnson testified that Morrison told him that there was a 12,000-mile warranty on the engine. The undisputed evidence indicates that this was a true statement. There was, therefore, no genuine issue of material fact with respect to the misrepresentation claim against Anderson. Johnson does not argue on appeal that the summary judgment was improper with respect to his misrepresentation claim against Jones. That issue has, therefore, been waived. Spradlin v. Spradlin, 601 So.2d 76 (Ala.1992).
For the foregoing reasons, the summary judgment, insofar as it pertains to count one (implied warranties) and count four (innocent misrepresentation), is affirmed. However, insofar as it pertains to count two (the express warranty claim against Jones) and count three (the negligence claim against Anderson), the summary judgment is reversed and the case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, and COOK, JJ., concur.
ALMON, J., concurs in the result.
BUTTS, J., concurs in part and dissents in part.
BUTTS, Justice (concurring in part and dissenting in part).
I concur in the affirmance of the summary judgment as to count four of Johnson's complaint and the reversal as to counts two and three.
I respectfully dissent from the affirmance of the summary judgment as to count one of Johnson's complaint, alleging the breach of an implied warranty by Anderson Ford, Inc. ("Anderson"), and Fred Jones Manufacturing Company ("Jones"). The majority holds that, as a matter of law, neither Anderson or Jones was the "seller" of the rebuilt engine at issue in this case. However, I believe Johnson presented substantial evidence creating a genuine issue of material fact as to whether Anderson or Jones was the seller of the engine received by Johnson; I would *231 reverse the summary judgment as to count one.
NOTES
[1] Johnson testified in his deposition as follows:

"Q. What kind of arrangement did you work out so you could get this engine?
"A. I went to Gerald with those parts, you know, and then
"Q. And who [is Gerald]?
"A. Gerald Morrison.
"Q. Who did he work for?
"A. Anderson Ford. And he told me he would call the rep [representative] or whatever, and so he called him and like the next day or two he came
"Q. Do you know what rep they were talking about?
"A. Gerald would know. It's some rep that maybeI don't know if he was over engines or whatever. Anyway, one of Gerald's bosses, I guess you could say, over the area or something.
"Q. Now, Anderson Ford was a Ford Motor dealership at that time; wasn't it?
"A. Right.
"Q. And the representative he was calling, did you understand it was a Ford representative?
"A. That's what I understood.
"Q. Were you there when he called him?
"A. Well, I was there. I met him in the next few days. I don't know if I was there when he called, but I met him in the next few days when he came in there. We met the next day or whenever he came through.
"Q. What was that guy's name?
"A. I don't remember.
". . . .
"Q. Did he identify himself to you?
"A. Yeah.
"Q. And did he identify himself as a Ford Motor Company representative?
"A. Right.
"Q. And what was discussed with him at that time?
"A. I told him what happened. Gerald had already told him what happened, but I told him again what happened, and he said, you know, he hated that it happened that, you know, those thingsit shouldn't have happened that quick, you know, for something to blow up it should've been after 200,000, maybe, or something like that. It should've been a long time later. But he said that they had had some problems with some of them; defective or blowing up, you know, or had some problem. And he said, you know, he would try to help me, and they said they wouldand after talking about it a while he said he wouldthey would get me an engine. They would get me a new engine or a rebuilt engine. I can't remember which one he said. It didn't matter to me as long as it was a good engine, you knowgive me an engine and if I'd pay him $1,000 and if I'd put it in where they wouldn't have the labor in it, you know, and have their mechanics
"Q. Who said that to you now?
"A. The Ford rep or who I thought was
"Q. This wasn't Gerald talking now?
"A. No.
"Q. Go ahead.
"A. Gerald was there, you know, when this was going on. I said, `Well, you know, how about $500?' He said, `If you'll buy a Ford againif you'll buy a Ford again we will do it for $500.' But I had to put it in you know. That cost themmaybe it cost the dealership $1,000 to put it in or whatever. But they wanted to avoid the labor on it, you know, putting it in. I said, `Well, okay. I've got some men that's, you know, mechanics that can do it.' And it took us like two days or something to put it in, you know.
"Q. So if I understand the agreement that you entered into with the Ford representative was that they would provide you with another rebuilt diesel engine for $500?
"A. Yeah.
". . . .
"Q. In your opinion, did Ford have an obligation to sell you a rebuilt engine for $500 at that time?
"A. No. They wasn't obligated to me, because I didn't have no warranty with them.
"Q. Didn't they tell you that it was for customer relations only that they were doing that?
"A. Yeah, and if I would, you know, buy another Ford and be a good customer, which I wasyou know, my intentions were.
". . . .
"Q. Mr. Johnson, when you initially bought your 1990 truck, you understood that the warranty on that vehicle came from Ford Motor Company?
"A. Right.
"Q. But you wentlike anybody else that owns a truck, you would go to the local dealership when you had a warranty problem?
"A. Right.
"Q. But you understood that the warranty on that vehicle, even though it had expired, that warranty came directly to you and was backed up by Ford Motor Company; correct?
"A. Right.
"Q. And there was an accommodation agreed to that they would replace the engine in your truck at some point in time?
"A. Right.
"Q. Now, was Ford directly involved in that?
"A. Yeah.
"Q. I think you've testified that the Ford rep was there?
"A. Right. FordI thought FordWhen Anderson FordFord was doing it, you know, for Anderson Ford to keep their rep good and everything.
"Q. And I think at some point earlier in your testimony you said this guy was like Gerald's boss?
"A. Well, not his boss. I mean it wasn't his boss.... But he was a representative from Ford that waswell, he could make deals with Ford that Gerald couldn't make. He could override something Gerald said or something.
"Q. Was that your understanding of what this representative's role was to get in here and try to get this thing settled with you?
"A. Right.
"Q. And you understood that guy to be working directly for Ford Motor Company?
"A. Right.
"Q. And did Gerald have to go through him to do anything with regard to making an accommodation for you, since that vehicle was already out of the Ford warranty?
"A. Right. Right."
[2] Johnson, arguing that there was a buyer-seller relationship between himself and Jones, concedes this in his reply brief:

"Fred Jones owned the engine, Anderson Ford claims not to have any ownership interest in the engine, Johnson next owns the engine. Therefore, as between Jones and Johnson a [successive] relationship to the same right of property exists. True, if Anderson purchased the engine from Jones and then sold it to Johnson, there would be an intervening relationship to the same right of property and Johnson would not have privity of contract with Jones. However, the overwhelming evidence as presented in Johnson's original filing, Anderson's brief, Anderson's answer (C.R. 22 & 23), and even Jones's brief is that no such intervening ownership existed. '10. Anderson was only acting as an intermediary in these transactions as an accommodation to the plaintiff....' Anderson's answer (C.R.22). `Sales, nominally to certain company but in fact to its customers, must be regarded as sales to its customers.' Barber-Greene Co. v. Gould, [215 Ala. 73,] 109 So. 364 (1926) [quoting West's headnote 5]. Therefore, privity exists between Fred Jones and Johnson, and Johnson is entitled to a jury trial on this issue."
[3] We note that under Jones's interpretation of Barré the intervention of a dealer in the sale of any product would render unenforceable an express warranty extended by the manufacturer to the ultimate purchaser/consumer.
[4] Holden had 35 years' experience as a general mechanic; 30 years' experience in rebuilding engines; and 21 years' experience in running his own shop.