[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1081 
On September 17, 1997, Tommy Rampey sued Novartis Consumer Health, Inc. ("Novartis"), manufacturer of "Ex-Lax," an over-the-counter laxative. As amended, Rampey's complaint, seeking injunctive relief and damages for economic loss, but not damages for personal injury, presented claims of breach of the implied warranties of merchantability and fitness for a particular purpose. The action was filed as a class action pursuant to Rule 23, Ala.R.Civ.P., on behalf of a class of persons "who purchased 'Ex-Lax,' which was manufactured, distributed, and sold by Defendant Novartis, over the four-year period preceding June 1997,[1] and who currently possess one or more partially or completely unused packages of 'Ex-Lax' that he previously purchased." Rampey alleged that Ex-Lax sold during that time frame contained the active ingredient phenolphthalein ("PPH"), a chemical that studies have shown causes precancerous and cancerous conditions in laboratory animals. After various filings by the parties, Novartis filed a motion for a summary judgment, which the trial court granted by an order filed with the circuit clerk on March 22, 2002. On that same date, but unaware that a summary judgment had been entered, Rampey executed "Plaintiff's Notice of Filing 'Second Amended Class Action Complaint,'" seeking to assert an unjust-enrichment claim. That notice and the proposed amended complaint attached to it were not filed with the circuit clerk until March 25, 2002. On April 15, having received a copy of the summary judgment, Rampey filed "Plaintiff's Motion to Vacate Judgment and Points and Authorities in Support," requesting that the summary judgment be vacated and that he be allowed to amend his complaint. The trial court entered an order denying the motion on April 22; that order stated, in relevant part:
 "On the 22nd day of March, 2002 the court entered an [order] granting summary judgment to defendants. Counsel for plaintiffs has now filed a motion to vacate that judgment and for leave to file an amended complaint. The court has considered that motion and is of the opinion that all post judgment motions are due to be and hereby are denied."
Rampey then filed this appeal.
On appeal, Rampey argues that the summary judgment must be reversed because, he says, (1) consumers are the proper parties to bring actions against manufacturers of over-the-counter pharmaceuticals for breach of the implied warranties of merchantability and fitness for a particular purpose where the active ingredient has been deemed "unsuitable"; (2) *Page 1082 
the filing of the action constituted sufficient notice to Novartis under Ala. Code 1975, 7-2-607; and (3) the trial court erred in denying Rampey's motion that he be allowed to file an amended complaint adding an unjust-enrichment claim.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, 'we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was 'entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is 'substantial' if it is of 'such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
The record reveals that before August 1997, the active ingredient in Ex-Lax was PPH, which had been approved by the Food and Drug Administration ("the FDA") for many years. On August 29, 1997, the FDA announced a proposal to "restrict" the use of PPH as a result of tests on laboratory animals that showed that PPH was a possible carcinogen. Subsequently, by a final rule issued on January 29, 1999, the FDA classified PPH as a drug "not 'generally recognized as safe and effective'" (as explained by the affidavit of Russell Jones, director of regulatory affairs for Novartis). After the proposal was announced, Novartis withdrew the PPH formulation of Ex-Lax on August 29, 1997, and replaced it with a reformulated version using a senna-based[2] active ingredient.[3] Rampey asserts that in 1995, before the FDA restricted the use of PPH and before Novartis changed the formulation of Ex-Lax, Novartis was aware of studies conducted by the National Toxicology Laboratory of the National Institutes of Health ("the NTNH")[4] that "questioned *Page 1083 
the safety of the chemical [PPH]."[5] Novartis stated in its "Response to Plaintiff's First Set of Requests for Admissions" that it was aware of such studies, but it asserted that the studies were inconclusive as to the health risks associated with use of Ex-Lax as directed.[6]
Barry Kesten, the senior brand manager for Ex-Lax from September 1995 until March 1999, stated in his affidavit that throughout Rampey's time frame of June 1993 to June 1997, Novartis did not sell Ex-Lax directly to consumers, but rather sold it "exclusively" to distributors and wholesalers, who in turn sold it to retailers, from whom consumers purchased it. Kesten also stated that during that same period, and, in fact, for the past 25 years, Ex-Lax was sold with an express money-back guarantee printed on the packaging. The guarantee provided on the packaging of the Ex-Lax formulation that contained PPH stated: "The Ex-Lax Guarantee: When taken at bedtime, Ex-Lax is guaranteed to work gently, [and] effectively by 8 AM or your money back. Return products to Sandoz,[7] attention Consumer Affairs for full refund."[8] Kesten further stated that it is Novartis's policy to provide a refund to any consumer who is dissatisfied with the product and returns an unused portion of the product or a proof-of-purchase. In accordance with that policy, Novartis will refund the purchase price, any sales tax, and the postage associated with the return. In addition, as a part of Novartis's withdrawal in 1997 of the Ex-Lax product containing PPH, it offered consumers, pursuant to the same return-of-product or proof-of-purchase requirement stated above, refunds for Ex-Lax containing PPH. That refund policy, which applied until April 1, 2000, provided a refund of the purchase price, any sales tax, and postage, and also provided a coupon good for the reformulated Ex-Lax. Kesten attested that, in an attempt to advertise this refund policy as it pertained to the PPH formulation of Ex-Lax, Novartis provided a toll-free 1-800 number for consumers and pharmacists to telephone for information regarding the PPH formulation of Ex-Lax, the reformulated version, and the refund. This 1-800 number was publicized in a press release issued by Novartis on August 29, 1997, announcing its withdrawal of the old formulation and its reformulation of Ex-Lax. Novartis also sent an "Action Line" telegram to pharmacists in the United States announcing the withdrawal of the old formulation and the reformulation, and reiterating the *Page 1084 
refund offer and the 1-800 number. Notices were also sent to distributors and wholesalers, and advertisements regarding the reformulation were publicized through a series of television advertisements and promotional displays.[9]
At some point in time before he filed suit in September 1997, Rampey had purchased three packages of the PPH formulation of Ex-Lax. Copies of the labels of those three packages are contained in the record. With respect to those packages, Rampey testified by deposition as follows:
 "Q: And I'm wondering if you gave any consideration, Mr. Rampey, to any kind of monetary relief or anything else that you could have done without filing a lawsuit?
 "Did you think about trying to do something without filing a lawsuit?
"A: No I didn't.
"....
 "Q: Do you know whether it was months or years before — let me back up.
 "It was before the lawsuit that you purchased these correct?
"A: Yes.
 "Q: Do you know whether that was months or years before the lawsuit?
"A: No, I don't.
"Q: Do you know how much you paid for them?
"A: The amount on the tag plus tax.
 "Q: And the amounts are $1.95 in the case of two and $1.99 in the case of one?
"A: Yes.
"Q: Do you know where you purchased them?
"A: No, I don't.
 "Q: You did not purchase them directly from Novartis, did you?
"A: No, I didn't.
 "Q: You would have purchased either at a grocery store or a drugstore or someplace like that?
"A: Sure.
"Q: Some retail type of store; is that right?
"A: Sure.
"....
 "Q: You never contacted [Novartis], the manufacturer of Ex-Lax, to ask for a refund, did you?
"A: No, I didn't.
 "Q: Were you aware from the publicity that you had heard about and any other information you had available to you that [Novartis] had such a refund offer?
"A: No, I wasn't.
 "Q: Is there anything that you're asking for in terms of any refund that's different from what you understand this language on the package [the guarantee] to be offering?
"A: No.
"....
 "Q: ... [E]ver have any complaint or problem with the Ex-Lax working the way it was supposed to?
"A: No, I didn't.
"Q: It did the job you needed it to do?
"A: Yes.
"Q: Was there ever a time when you took Ex-Lax during this period and it did not work for you?
"A: No.
 "Q: Did you ever take these three boxes, Exhibits 1, 2, and 3, did you ever take them back to the store where you bought them and request a refund?
"A: No, I didn't.
"Q: Or request a replacement product? *Page 1085 
"A: No, I didn't.
"Q: Did it ever occur to you to do that?
"A: No, it didn't."
Rampey states in his brief to this Court that Novartis impliedly warranted that the Ex-Lax formulation containing PPH was "fit for the purposes for which it would be used by consumers — i.e., that Ex-Lax was safe and effective." However, as noted, Rampey seeks only damages for economic loss, as opposed to damages for personal injury. Specifically, paragraph 35 of his amended complaint, states, in relevant part, "plaintiff and the class are entitled to recover amounts necessary to replace the 'Ex-Lax' containing [PPH] currently in their possession; ... and such other damages as are proper (in an amount less than $75,000.00, and excluding punitive damages) as determined at trial." Also, in his "Response to [Novartis's] Second Set of Interrogatories," Rampey responded as follows to questions regarding the type of damages he seeks:
 "Interrogatory 17. Do you seek to recover damages for any personal injury, including any medical illness or condition or other adverse health effect, that you contend you suffered as a result of your 'Ex-Lax?' If so, please provide the following information:
"....
 "Response: [Rampey] objects to this request to the extent that it is unduly burdensome and is not reasonably limited in time and scope. Subject to the foregoing objection, [Rampey] responds no.
 "Interrogatory 18. Do you contend that other potential members of the putative class are entitled to recover damages for any personal injury, including any medical illness or condition or other adverse health effect, suffered as a result of your use of 'Ex-Lax?' If so, please identify all such persons (including name, address, and telephone number) and describe any and all such personal injuries in detail.
 "Response: [Rampey] objects to this request to the extent that it requires a legal conclusion. Subject to the foregoing objection, [Rampey] responds no.
 "Interrogatory 19. Do you seek to recover damages for any economic loss or injury that you contend you suffered as a result of your purchase or use of 'Ex-Lax?' If so, please describe any such economic loss or injury in detail.
"Response: See Response to Interrogatory 12."
Interrogatory 12 and Rampey's response are as follows:
 "Interrogatory 12. In paragraph 9 of your Complaint, you state, '[Rampey] and the Plaintiff Class seek relief in the form of actual damages.' With regard to this statement, please identify each element of actual damages for which you seek recovery in the action, including the amount sought for each such element and a description of how the amount was calculated. [To the extent this interrogatory may be viewed as calling for an opinion or legal conclusion, Novartis agrees your counsel may answer this interrogatory on your behalf. See General Instruction 1 above].
 "Response: [Rampey] objects to this interrogatory to the extent that it is repetitive and requires a legal opinion or legal contention that it is protected by the work product privilege. Novartis's agreement to allow counsel to answer this question is insufficient to waive the privilege held by [Rampey].
 "Subject to the foregoing objection, [Rampey] has not completed an analysis of damages, but will supplement this response in accordance with his obligations *Page 1086 
under the Alabama Rules of Civil Procedure."
The trial court's summary-judgment order states, in pertinent part:
 "[Rampey's] complaint alleges that [Novartis] produced the product Ex-Lax, that [Rampey] purchased Ex-Lax, that the formulation of Ex-Lax contained a chemical which has been found to be carcinogenic, [and] that Novartis has reformulated Ex-Lax and has removed the chemical. [Rampey] claims that Novartis has breached an implied warranty and that as a result he and other members of the putative class have suffered economic damages. There is no claim for physical injury.
 "[Novartis's] motion for summary judgment alleges two separate grounds. The first is that no notice was given to [Novartis] as required by the [Uniform Commercial Code] prior to the filing of this action. [Rampey] concedes that no separate notice was given but that the filing of this action constituted notice. The case of Hobbs v. General Motors Corporation, 134 F. Supp.2d 1277
(M.D. Ala. 2001), [d]eals with notice requirements. Hobbs concerns an express warranty but the analysis would seem to apply in this case. In Hobbs the District Court held:
 "`Accordingly, this court concludes that the mere filing of a lawsuit in this case did not constitute notice of breach under Alabama law. 134 F. Supp.2d at 1284.'
 "Consequently, it would appear that [Novartis] would be entitled to prevail.
 "The second ground raised by [Novartis] concerns privity. [Rampey] purchased Ex-Lax from a retail establishment. [Novartis] has filed an affidavit which states that Novartis does not sell Ex-Lax to individuals. Sales are made to distributors who then market the product to retailers. There was no evidence to the contrary. It would therefore seem that [Novartis] would be entitled to summary judgment based on lack of privity."
Rampey argues that a consumer is the proper party to bring an action for breach of the implied warranties of merchantability and fitness for a particular purpose under Alabama's Uniform Commercial Code ("UCC") against manufacturers of over-the-counter drugs where the active ingredient used in such drugs is "unsuitable." Ala. Code 1975, 7-2-314, the implied-warranty-of-merchantability section of Alabama's UCC, states, as it pertains to the issue presently before us:
 "(1) Unless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.
"(2) Goods to be merchantable must be at least such as:
 "(a) Pass without objection in the trade under the contract description; and
 "(b) In the case of fungible goods, are of fair average quality within the description; and
 "(c) Are fit for the ordinary purposes for which such goods are used; and
 "(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
 "(e) Are adequately contained, packaged, and labeled as the agreement may require; and
 "(f) Conform to the promises or affirmations of fact made on the container or label if any." *Page 1087 
The section of the UCC on the implied warranty of fitness for a particular purpose, Ala. Code 1975, 7-2-315, states, in relevant part:
 "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose."
The law in this State is that a claim for breach of an implied warranty is not available against a manufacturer who was not involved in the transaction pursuant to which the complaining party purchased the product. For example, in Wellcraft Marine v. Zarzour, 577 So.2d 414 (Ala. 1990), Zarzour, the purchaser of an allegedly defective boat, sued Wellcraft Marine, the boat manufacturer; Economy Marine, Inc., the seller of the boat; and Cincinnati Insurance Company, the insurer of the boat, asserting claims that included breach of implied warranties. The trial court directed a verdict in favor of Wellcraft as to Zarzour's breach-of-implied-warranty claims; Zarzour appealed the directed verdict and various other rulings by the trial court. On appeal, addressing Zarzour's argument as to his breach-of-warranty claims, this Court stated:
 "Zarzour argues that there was privity between himself and Wellcraft and that because of this privity the trial court erred in directing a verdict for Wellcraft on his implied warranty claims. Wellcraft, and not Economy, provided Zarzour with a written warranty covering the boat. 'While Alabama's version of U.C.C. 2-318 has abolished the privity requirements in actions involving injuries to natural persons, the privity requirements still remain in cases of strictly economic injury.' State Farm Fire Cas. Co. v. J.B. Plastics, Inc., 505 So.2d 1223, 1227
(Ala. 1987). There is no right of action on an implied warranty theory against a manufacturer for property damage without privity of contract; Section 7-2-318, Ala. Code 1975, provides, 'A seller's warranty, whether express or implied, extends to any natural person. . . .' . . . 'Seller' is defined as 'a person who sells or contracts to sell goods,' 7-2-103(1)(d). Further, 7-2-314 (the implied warranty of merchantability section) and 7-2-315 (the implied warranty of fitness for a particular purpose section) both apply to the 'seller.' In this case, Economy was the seller, not Wellcraft."
577 So.2d at 419 (emphasis omitted). Accordingly, this Court upheld the directed verdict for Wellcraft on Zarzour's implied-warranty claims. Id.
In Ex parte General Motors Corp., 769 So.2d 903 (Ala. 1999), Tucker purchased an automobile manufactured by General Motors Corporation ("GM") from Jim Bishop Chevrolet-GEO-Buick-Olds, Inc. ("Bishop"), an automobile dealer. Shortly after Tucker bought the vehicle, it began stalling while he was driving it. Tucker repeatedly took the car back to Bishop for repairs to correct the stalling problem. On one particular occasion, while Tucker was driving the vehicle, it began to overheat, and Tucker had to pull over on to the side of the road. After the vehicle's engine cooled, it would not restart. Tucker contacted a wrecker service, but because it was a holiday weekend he was told that the vehicle could not be towed until the following day. Tucker left the car on the side of the road overnight and during the night it was vandalized. Bishop refused to repair the vehicle, and on the advice of his attorney, Tucker stopped making payments on his automobile loan, and the vehicle was repossessed. Tucker sued GM *Page 1088 
and Bishop, alleging breach of express warranties, and Bishop, alleging breach of the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. The trial court entered a summary judgment for the defendants, and Tucker appealed. On appeal, the Court of Civil Appeals affirmed the trial court's judgment as to Tucker's breach-of-implied-warranties claim against GM[10] and his claim alleging breach of the implied warranty of fitness for a particular purpose against Bishop. It reversed the trial court's judgment as to Tucker's claim that Bishop breached the implied warranty of merchantability and that Bishop and GM had breached their express warranties. Tucker v. General Motors Corp., 769 So.2d 895
(Ala.Civ.App. 1998). This Court granted the defendants' petitions for certiorari review, and, in the resulting opinion, agreed with the Court of Civil Appeals that had Tucker alleged breach-of-implied-warranty claims against GM, a summary judgment would have been proper. We explained:
 "In its opinion in this case, the Court of Civil Appeals held that under Alabama's version of the Uniform Commercial Code ..., implied warranties are applicable only to sellers. [Tucker v. General Motors Corp.,] 769 So.2d [895] at 901-02 [(Ala.Civ.App. 1998)]. We agree; that holding is an accurate statement of the law. See Rhodes v. General Motors Corp., 621 So.2d 945, 947 (Ala. 1993). If Tucker had alleged a breach of implied warranty as to GM, a summary judgment would be proper as to any such claim."
769 So.2d at 910.
In Rhodes v. General Motors Corp., 621 So.2d 945 (Ala. 1993), cited in the passage from Ex parte General Motors quoted above, the Rhodeses, purchasers of an allegedly defective automobile, sued GM, the manufacturer of the vehicle; Chrysler Credit Corporation ("Chrysler"), the financier of the vehicle; and David Jones Chevrolet, the seller of the vehicle, asserting claims including breach of the implied warranty of merchantability. The action was filed after the Rhodeses had brought the vehicle back to Jones Chevrolet for a third repair and Chrysler had repossessed the vehicle because the Rhodeses had failed to make the scheduled payments. The trial court entered a summary judgment in favor of the defendants, and the Rhodeses appealed. Analyzing the UCC and relying on our earlier decision in Wellcraft Marine, supra, this Court stated:
 "We note that each section in the Uniform Commercial Code dealing with implied warranties places obligations on the seller of goods. In this case, [GM] was the manufacturer of the automobile, and Jones was the seller. 7-2-103(1)(d). In Wellcraft Marine v. Zarzour, 577 So.2d 414 (Ala. 1990), we stated: 'There is no right of action on an implied warranty theory against a manufacturer for property damage without privity of contract.' 577 So.2d at 419. (Emphasis in Wellcraft). Similarly, we conclude that, without privity of contract, there is no right of action against a manufacturer for direct economic loss."
621 So.2d at 947. (Footnote omitted.) The Rhodes Court also stated:
 "The Rhodeses contend that in extending a written warranty, [GM] created privity of contract with the Rhodeses. *Page 1089 
When presented with a similar contention in Wellcraft, we held: 'Regardless of any express warranties that a manufacturer may wish to give with a product, by their very language the commercial code's implied warranty sections may apply to the seller of the product.' Id. at 414. (Emphasis added [in Rhodes].)"
Id. See also Bryant v. Southern Energy Homes, Inc., 682 So.2d 3, 5 (Ala. 1996) ("Under Alabama law, the implied warranty of fitness for a particular purpose does not apply to Southern Energy, who was the manufacturer, not the seller, of the mobile home."); Johnson v. Anderson Ford, Inc., 686 So.2d 224, 227-28 (Ala. 1996) ("Section 7-2-314 and7-2-315 both apply to the 'seller' of a product.").
As noted in the material quoted earlier from Wellcraft, 577 So.2d at 419, Ala. Code 1975, 7-2-318 abolished privity requirements only in actions involving personal injury to natural persons. Specifically,7-2-318 provides:
 "A seller's warranty, whether express or implied, extends to any natural person if it is reasonable to expect that such a person may use, consume or be affected by the goods, and who is injured in person by the breach of the warranty. A seller may not exclude or limit the operation of this section."
(Emphasis added.) See also Johnson v. Anderson Ford, Inc., 686 So.2d at 228 ("The privity of contract that arises out of the seller/buyer relationship was absent here. That absence, in cases of strictly economic harm ..., is fatal to an implied warranty claim under either 7-2-314 or7-2-315."); Kidd v. Kilpatrick Chevrolet, Inc., 613 So.2d 336, 338 (Ala. 1993) ("Alabama has abolished privity requirements in actions involving personal injuries, but actions where the claim alleges purely economic injury, such as this case, privity is still required."); State Farm Fire Cas. Co. v. J.B. Plastics, Inc., 505 So.2d 1223, 1227 (Ala. 1987) ("While Alabama's version of U.C.C. 2-318 has abolished privity requirements in actions involving injuries to natural persons, the privity requirements still remain in cases of strictly economic injury."); Chandler v. Hunter, 340 So.2d 818, 822 (Ala.Civ.App. 1976) ("there is no right of action on an implied warranty of merchantability of fitness for use where the injury sustained was economic unless there is privity of contract").
In the instant case, it is undisputed that Novartis manufactured the Ex-Lax purchased by Rampey. It is also undisputed that Rampey did not purchase the Ex-Lax directly from Novartis; rather, he purchased it from a retailer such as a drugstore or grocery store. Additionally, the damages sought by Rampey, as evidenced by his amended complaint and his responses to interrogatories 17 and 18 of Novartis's second set of interrogatories, and without any intervening amendment or supplementation by the time of the entry of the summary judgment, are limited to damages for an economic injury. Rampey forthrightly acknowledges in his reply brief that "economic injuries [are] what is at issue here." Accordingly, in light of the foregoing legal authority, we conclude that because Novartis is the manufacturer and not the seller of Ex-Lax, no privity exists between it and Rampey; therefore, Rampey cannot complain against Novartis for a breach of implied warranties.
Rampey, however, relying on Cheminova America Corp. v. Corker,779 So.2d 1175, 1180 (Ala. 2000), argues that because the Ex-Lax sold by Novartis containing PPH was "unsafe," it violated an implied warranty of merchantability. We conclude that Cheminova is distinguishable from *Page 1090 
this case. In Cheminova, Cheminova International was the manufacturer of "Skin Cap," an over-the-counter medication that contained the ingredient zinc pyrithione.[11] Cheminova America ("Cheminova") was the distributor of Skin Cap. Cheminova and Acuderm, Inc., entered into an agreement pursuant to which Acuderm became a "nonexclusive" distributor of Skin Cap.[12] Acuderm marketed the product for use as a psoriasis treatment. Before entering into the distribution agreement, Acuderm was aware of reports that Skin Cap contained a steroid, but it received assurances from Cheminova that Skin Cap was safe and that the product contained no steroids. Acuderm's literature on Skin Cap specifically stated that it was steroid-free. Acuderm sold Skin Cap directly to consumers and pharmacies. It sold approximately 22,000 units of Skin Cap pursuant to its distribution agreement with Cheminova. Thereafter, Acuderm received a warning statement from the FDA stating that Skin Cap contained a "potent corticosteroid and should not be used without a physician's supervision." 779 So.2d at 1177. Acuderm agreed to recall all of its Skin Cap products.
Corker, the plaintiff, was first told by her dermatologist about Skin Cap a few months before the FDA sent the warning statement to Acuderm. Unaware of the controversy concerning Skin Cap, Corker purchased the product from Nixon Drugs, a retail establishment, at a point after Cheminova and Acuderm already knew of the reports that Skin Cap contained steroids. The label on the can of Skin Cap that described the ingredients of the product made no mention of steroids. Corker stated that even after the date of the recall, neither Cheminova nor Acuderm informed her that the product was dangerous. It was not until several months later that Corker learned from another dermatologist that Skin Cap had been "marketed illegally." The dermatologist informed Corker that some of the problems she was having with her skin were a result of using Skin Cap. Corker then sued, personally and on behalf of a putative class, Cheminova International, Cheminova, Acuderm, and Nixon Drugs, asserting claims that included a claim of "breach of warranty." The trial court certified the action as a class action; Cheminova and Acuderm appealed the certification order. Addressing the "commonality" requirement of Rule 23(a), Ala.R.Civ.P., this Court stated: "A sale of a product that is not fit for use as described violated the implied warranty of merchantability — that the product is fit for its intended purpose — an implied warranty that under the U.C.C. accompanies each sale by a merchant. 7-2-314, Ala. Code 1975." 779 So.2d at 1180. This Court went on to state:
 "The defendants contend that the variations in the degree of privity the separate class members had with the defendants, variations caused by the application of the laws of the several states, are so great that this action may not proceed as a class action. However, we believe any problems caused by those variations would be manageable. Those who are in the direct-purchaser subclass are in privity with Acuderm."
Id. (Emphasis added.) Unlike the situation in Cheminova, the seller of the *Page 1091 
Ex-Lax purchased by Rampey is not a defendant in this action. In Cheminova, Corker sued the manufacturer of Skin Cap as well as the sellers of Skin Cap — Acuderm and Nixon — both of which sold the product directly to consumers, thereby, as to those direct sales, satisfying the privity requirement. Cheminova does not support Rampey's argument that he has a valid claim against the manufacturer of Ex-Lax, Novartis, for breach of the implied warranty of merchantability or breach of the implied warranty of fitness for a particular purpose. There simply was no privity of contract between Rampey and Novartis in the transaction whereby the Ex-Lax produced by Novartis ultimately made its way to Rampey.
Rampey also asserts, relying on Dennis Joslin Co., L.L.C. v. Tate,779 So.2d 217 (Ala. 2000), that the "un-cross-examined" affidavit of Barry Kesten does not present substantial evidence that Rampey is not in privity with Novartis, sufficient to entitle it to a judgment as a matter of law. Rule 56(e), Ala.R.Civ.P., states, in pertinent part:
 "(e) Form of Affidavits; Further Testimony; Defense Required. . . . When a motion for summary judgment is made and supported as provided by this rule, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against him."
(Emphasis added.) In the instant case, Novartis provided Kesten's affidavit as evidentiary support for its assertion in its summary-judgment motion that Rampey lacked the requisite privity with Novartis to maintain a claim of breach of implied warranties. Rampey did not submit evidence in opposition to Kesten's attestations and, as noted, he testified that he has purchased the product only at the retail level. "When no evidence is offered to contradict that presented by the movant, then the court has no alternative but to consider the evidence uncontroverted; and summary judgment, if warranted by such evidence, may be entered against the non-moving party." Butler v. Michigan Mutual Ins. Co., 402 So.2d 949, 953 (Ala. 1981). Consequently, because Rampey attempted no contradiction of Kesten's factual assertions, the trial court properly entered a summary judgment for Novartis.
Rampey also contends that because Novartis issued the refund it offered for a consumer's purchase of the formulation of Ex-Lax containing PPH directly to its consumers, consumers are the intended beneficiaries of the contractual implied warranty of merchantability. Specifically, Rampey argues that because Novartis agreed to refund the consumer's money when it reformulated Ex-Lax, rather than having the refund issued by a retailer or a distributor, "[t]here are sufficient facts in the record to create a triable issue of fact as to whether Novartis's duty embodied in the implied warranty of merchantability runs to Plaintiffs." Rampey further contends that recognition that the implied warranty of merchantability runs from manufacturers of prepackaged over-the-counter drugs to consumers would be consistent with Alabama's causal-relationship doctrine because it is the manufacturer, not the retailer or distributor, that creates the defective condition.
However, without addressing the possible merit of those arguments, our review of the record reveals that Rampey did not assert either of those arguments to the trial court. This Court cannot *Page 1092 
consider arguments raised for the first time on appeal; rather, our review is limited to the evidence and the arguments considered by the trial court. Brannan Guy, P.C. v. City of Montgomery, 828 So.2d 914
(Ala. 2002). See also Andrews v. Merritt Oil Co., Inc., 612 So.2d 409
(Ala. 1992). Therefore, we will not consider Rampey's "third-party-beneficiary" or causal-relationship argument for purposes of a reversal of the judgment. Accordingly, we conclude that Rampey's claims of breach of implied warranties do not extend to Novartis, and the trial court did not err as a matter of law by entering a summary judgment in favor of Novartis. Because of our conclusion on this issue, we need not address the issue regarding the sufficiency of notice to Novartis.
The final issue that must be addressed, however, is whether the trial court erred by denying Rampey leave to amend his complaint a second time in order to assert an unjust-enrichment claim. Rule 15(a), Ala.R.Civ.P., which provides when a pleading may be amended, states, in relevant part:
 "(a) Amendments. Unless a court has ordered otherwise, a party may amend a pleading without leave of court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forty-two (42) days before the first setting of the case for trial, and such an amendment shall be freely allowed when justice so requires. Thereafter, a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause."
Under Alabama law, whether to allow amendments to pleadings is within the discretion of the trial court. For example, in Deputy Sheriffs Law Enforcement Association of Mobile County v. Mobile County, 590 So.2d 239
(1991), deputy sheriffs in Mobile challenged the denial of a pay increase for deputies by the Mobile County Commission ("the Commission"). They argued that pursuant to Local Act No. 82-444 ("the Act"), which provided that all deputy sheriffs in Mobile County would receive any salary increase granted to any class of county employees, they were entitled to the same 20% salary increase received by engineers who worked for Mobile County. The Commission and the Personnel Board of Mobile County ("the Board") denied the deputy sheriffs' request, and the deputies sued. On cross-motions for a summary judgment, the trial court held that the Act was unconstitutional and entered a summary judgment in favor of the Commission and the Board. Thereafter, the deputies sought to amend their complaint. The Commission and the Board moved to strike the proposed amendment, and the trial court granted their motion. Upholding the denial of the deputies' leave to amend their complaint, this Court stated:
 "The Deputies contend that the trial court should have allowed them to amend their complaint, after entry of summary judgment, to add a new cause of action. They only cite Rule 15(a), [Ala.]R.Civ.P., as support for this claim. Specifically, they point to the language in Rule 15(a) that states 'such amendments shall be freely allowed when justice so requires.'
 "The Deputies totally ignore cases such as Government Street Lumber Co. v. AmSouth Bank, N.A., 553 So.2d 68
(Ala. 1989), which found no abuse of discretion when a trial court disallowed an amendment after a summary judgment motion had been filed and scheduled for hearing. Applying the holding of Government Street Lumber Co., we cannot logically hold that the trial court abused its discretion by disallowing an amendment *Page 1093 
after the summary judgment had been entered."
590 So.2d at 243. See also Kilgore v. Alabama By-Products Corp.,581 So.2d 872, 874 (Ala.Civ.App. 1991).
In this case, Rampey filed his original complaint on September 17, 1997. On August 21, 2000, Rampey filed his first amended complaint, and on March 25, 2002, three days after the summary judgment was entered against him, he filed notice of the second amended complaint. Four and one-half years had passed before Rampey proffered the second amended complaint, and he did not proffer it until after the trial court's March 22, 2002, order entering a summary judgment in favor of Novartis.
Rampey argues that because his unjust-enrichment claim arises from the "same nucleus of operative facts" as the claims asserted in his original and his "Amended And Restated Complaint," it adds no additional facts that must be litigated. Thus, he argues, pursuant to Rule 15(c)(2) Ala.R.Civ.P., the amendment would relate back to the claims presented in the original complaint, and Novartis would not be prejudiced if the amendment were allowed. In support of this contention, Rampey relies on this Court's decision and rationale in McElrath v. Consolidated Pipe Supply Co., 351 So.2d 560 (Ala. 1977), in which we held that the trial court abused its discretion by refusing to allow the defendant to amend his answer because of the close proximity of the trial given that the defendant had not completed its last deposition until three weeks before the amendment was offered and the plaintiffs were unable to show any prejudice that would result from the amendment's being allowed. As already noted, the procedural posture of this case at the time Rampey tendered his third version of his complaint was entirely different, being postjudgment. Accordingly, in light of this Court's decision in Deputy Sheriffs Law Enforcement Association of Mobile County, supra, we conclude that the trial court did not exceed its discretion by denying Rampey's motion for leave to amend his complaint.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur.
[1] Nowhere in the record or the parties' briefs is the reason for selecting June 1997 as the "cut-off" date explained.
[2] The record shows that senna is derived from the senna plant.
[3] On January 29, 1999, the FDA issued a "determination" classifying PPH as a "new drug." Such classification disallows any person or entity from marketing a product in the United States that contains PPH without first submitting an application to the FDA that demonstrates that the compound is "generally recognized as safe and effective." 
[4] In his brief to this Court, Rampey states that the NTNH "examined" the safety of PPH "during the relevant time period," which he defines as "the four years preceding the institution of this suit," and that PPH was found to have the potential for producing cancers. Rampey cites to page 316 of the record as support for his statement, but at that page there appears a press release, dated May 15, 2000, issued by the "National Institute of Environmental Health Sciences." Request 13 in "Plaintiff's First Set of Requests for Admissions to [Novartis]" asks that Novartis admit that in 1995 it became aware of studies conducted by the "National Toxicology Board." We infer that Rampey is referring to the NTNH, although he uses a different title. For purposes of simplification, we refer to the entity as the NTNH.
[5] Rampey also states that the other studies reached the same conclusions as those reached in the NTNH study. However, all of the results from those studies were released after Novartis had withdrawn the formulation of Ex-Lax using PPH as the active ingredient.
[6] Nothing in the record directly evidences the 1995 studies to which Rampey refers. Rather, Rampey's cite to the record, as stated in note 4, supra, refers to the May 15, 2000, press release issued by the "National Institute of Environmental Health Sciences," which states: "Today, the Department of Health and Human Services released the Report on Carcinogens 9th edition," prepared by the "National Toxicology Program." That Report is described in the press release as having identified substances that are "known" or are "reasonably anticipated" to cause cancer. The press release identifies PPH as a chemical designated in the report as carcinogenic. Nonetheless, Novartis raises no issue about the studies Rampey relies on, i.e., 1995 studies or the studies underlying the 2000 report.
[7] Sandoz Pharmaceuticals, Inc. ("Sandoz"), is the predecessor company of Novartis. Sandoz acquired the Ex-Lax brand in 1981.
[8] Each label also contained the mailing address for Sandoz.
[9] In addition to Kesten's affidavit, these statements are supported by the affidavit of Nancy Casper, the director of consumer and professional affairs for Novartis.
[10] We note, as stated in a footnote in the Ex parte General Motors opinion, that pursuant to the procedural history provided in the opinion, Tucker did not assert a breach-of-the-implied-warranties claim against GM. 769 So.2d at 905 n. 1. Nevertheless, the Court of Civil Appeals addressed that issue.
[11] The opinion in Cheminova does not provide a better description of what Skin Cap is, but we infer, based upon our reading of the trial court's order quoted in the opinion, that it is a topical solution that is applied directly to a user's skin.
[12] The Cheminova opinion does not identify Acuderm; however, because of the "nonexclusive" nature of the distributorship agreement entered into between it and Cheminova, we infer that Acuderm was also a distributor of pharmaceuticals.