949 So.2d 916 (2006)
HARRIS MORAN SEED COMPANY, INC.
v.
Edward A. PHILLIPS, individually, and Eddie Phillips, individually, and Edward A. Phillips and Eddie Phillips d/b/a Phillips Tomato Farms
Edward A. Phillips, individually, and Eddie Phillips, individually, and Edward A. Phillips and Eddie Phillips d/b/a Phillips Tomato Farms
v.
Harris Moran Seed Company, Inc.
2040746.
Court of Civil Appeals of Alabama.
June 23, 2006.
Rehearing Denied August 4, 2006.
*918 Robert S. Lamar, Jr., and Rick D. Norris, Jr., of Lamar, Miller, Norris, Haggard & Christie, P.C., Birmingham, for appellant/cross-appellee Harris Moran Seed Company, Inc.
Larry W. Harper, William D. Motlow, Jr., and W. Perry Webb of Porterfield, Harper, Mills & Motlow, P.A., Birmingham, for appellees/cross-appellants Edward A. Phillips, individually, and Eddie Phillips, individually, and Edward A. Phillips and Eddie Phillips d/b/a Phillips Tomato Farms.
CRAWLEY, Presiding Judge.
Edward A. Phillips, individually, and Eddie Phillips, individually, and Edward A. Phillips and Eddie Phillips doing business as Phillips Tomato Farms (hereinafter collectively referred to as "the farmers") sued Bueford Haynes, Haynes Plant Farm, Harris Moran Seed Company, Inc. ("HMSC"), Philip Ashcraft, and several fictitiously named defendants. The farmers' complaint alleged claims of, among others, breach of contract, fraudulent suppression, negligence, wantonness, and claims seeking damages under the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD"). Ashcraft was never served, named parties were never substituted for the fictitiously named defendants, and the claims against Haynes and Haynes Plant Farm were dismissed,[1] thus leaving HMSC as the sole defendant.
The farmers' complaint alleged that they were commercial farmers; that they had bought from Haynes and Haynes Plant Farm tomato plants that were represented to be of the "Mountain Fresh" variety; that the tomato plants had been grown from seeds produced and distributed by HMSC; that the tomatoes harvested from the plants were small, misshapen, and uncharacteristic of Mountain Fresh tomatoes; that the tomatoes were unmarketable; and, consequently, that the farmers had suffered a reduced crop yield, and lost income and business profits, for which they were seeking compensatory and punitive damages.
The case was tried to a jury. The evidence at trial established that HMSC is a California corporation engaged in the business of producing and selling vegetable seeds, including tomato seeds. During 1998 and 1999, HMSC sold a variety of hybrid tomato seeds known as "Mountain Fresh" to independent dealers pursuant to written dealer agreements. One of HMSC's independent dealers was Clifton Seed Company of North Carolina. In 1998, Clifton Seed Company purchased from HMSC a quantity of Mountain Fresh tomato seeds for resale.
The farmers decided, based upon the results of Auburn University field trials and good reports from other commercial growers, to plant Mountain Fresh tomatoes during the 1999 growing season.[2] *919 They informed Bueford Haynes, the owner of Haynes Plant Farm in Cullman County, of their decision, and Haynes ordered Mountain Fresh seeds from Clifton Seed Company. Clifton Seed Company sent Haynes Plant Farm seeds that were a part of HMSC lot number 140382.021. Haynes Plant Farm grew the seeds into seedling tomato plants and sold 96,000 plants to the farmers. The farmers set out the plants in six staggered plantings of 16,000 each. The first two plantings were successful, producing healthy plants with large, rounded Mountain Fresh tomatoes as the farmers had anticipated. The other four plantings, however, yielded very different results. Although the plants themselves were vigorous and healthy, the tomatoes were undersized, misshapen, and bore no resemblance to Mountain Fresh tomatoes. Most of the tomatoes in the last four plantings were unmarketable. The farmers complained to Haynes and Haynes Plant Farm and also wrote a letter to HMSC. HMSC sent senior sales representative Michael Hannah to the farmers' fields in October 1999. HMSC recalled the seeds in lot number 140382.021 sometime in the fall of 1999.
HMSC had obtained the seeds in lot number 140382.021 from a seed producer in the Peoples Republic of China, with which it had done business for two years. After HMSC received the seeds from China, it performed test "grow-outs" of randomly selected seeds from the shipment. The grow-outs produced no "off-type" fruit, that is, no fruit uncharacteristic of Mountain Fresh tomatoes. After selling the seeds at issue in this case, however, HMSC began receiving complaints about the tomatoes produced from the seeds in lot number 140382.021. HMSC then performed another grow-out of the seeds in that lot and determined that 14 percent of the seeds were off-type, that is, not Mountain Fresh hybrid seeds. HMSC then performed an electrophoresis hybridity test on the seeds; that test indicated that some of the seeds in lot number 140382.021 were the product of female inbreeding. The evidence at trial established that female inbreeding occurs as a result of the self-pollination of a tomato plant. In hybrid-tomato-seed production, the pollen-producing part of a female parent plant must be removed before self-pollination occurs; pollen from a male parent plant must then be collected and used to pollinate the female parent plant. If the pollen-producing part of the female plant is not removed in time, the plant will self-pollinate and hybridization will be thwarted.
At the close of the farmers' evidence, the trial court granted HMSC's motion for a judgment as a matter of law ("JML") on all claims except the one alleging the breach of a contract between HMSC and Clifton Seed Company to which the farmers asserted they were third-party beneficiaries. The jury rendered a verdict in favor of the farmers and assessed damages at $55,000. Following the denial of its postjudgment motion, HMSC filed a timely appeal to the Alabama Supreme Court, and the farmers filed a timely cross-appeal. The supreme court transferred the appeals to this court pursuant to § 12-2-7(6), Ala.Code 1975.
On appeal, HMSC raises three issues. First, it argues that the trial court erred by failing to grant its motion for a JML on the contract claim because, it says, the farmers were not intended third-party beneficiaries of the dealer agreement between HMSC and Clifton Seed Company or, in the alternative, the farmers' claim was barred by the one-year time-to-sue limitation specified in the dealer agreement *920 between HMSC and Clifton Seed Company. Second, HMSC contends that the trial court erred by charging the jury that it could award the farmers compensatory damages, including damages for loss of crop yield and loss of profits, because, HMSC maintains, the dealer agreement between HMSC and Clifton Seed Company included a limitation-of-remedies provision that excluded incidental and consequential damages such as loss of crop yield and loss of profits. Third, HMSC claims that the trial court erred by denying its postjudgment motion without a hearing. On the cross-appeal, the farmers argue that the trial court erred by entering a JML as to their claims alleging negligence, wantonness, fraudulent suppression, and liability under the AEMLD.

HMSC's Arguments on the Appeal

The Third-Party-Beneficiary Claim
At trial, the farmers based their theory of recovery against HMSC on their assertion that they were intended third-party beneficiaries of HMSC's dealer agreement with Clifton Seed Company and that their breach-of-contract claim was premised on the "true to type" express warranty made by HMSC in that agreement. HMSC argues that they were entitled to a JML on the farmers' third-party-beneficiary claim.
"`"[T]his Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."'"
Alabama Great S.R.R. Co. v. Johnson, 874 So.2d 517, 520 (Ala.2003).
HMSC argues that the farmers were only incidental beneficiaries, as opposed to intended beneficiaries, of the dealer agreement containing the express warranty.
"To recover under a third-party beneficiary theory, the complainant must show: 1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached."
Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc., 512 So.2d 99, 101-02 (Ala.1987). Whether the farmers were third-party beneficiaries is a mixed question of law and fact, and the determination of third-party beneficiary-status is a conclusion of law that we review de novo. See Glass v. United States, 258 F.3d 1349, 1353 (Fed.Cir.2001). In determining third-party-beneficiary status, it is permissible for *921 the court to look at the surrounding circumstances as well as the agreement itself. See Holley v. St. Paul Fire & Marine Ins. Co., 396 So.2d 75, 80 (Ala.1981).
The dealer agreement, dated June 24, 1998, set out the terms and conditions under which HMSC agreed to sell to Clifton Seed Company and Clifton Seed Company agreed to buy from HMSC seeds for resale. The agreement contains the following "exclusive express warranty" and "disclaimer of warranty" provisions:
"EXCLUSIVE EXPRESS WARRANTY

"[HMSC] hereby states, as its sole and exclusive warranty that [HMSC] . . . seeds conform to label descriptions that are required by State and Federal law. . . . "
"DISCLAIMER OF WARRANTY

"[HMSC] MAKES NO OTHER EXPRESS WARRANTY. [HMSC] DISCLAIMS ALL IMPLIED WARRANTIES INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY AND ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. TO THE EXTENT PERMITTED BY STATE AND FEDERAL SEED LAW, ALL [HMSC] . . . SEEDS ARE SOLD AS IS."
(Capitalization in original.)
The federal law referenced in the foregoing contract provisions is the Federal Seed Act, 7 U.S.C. § 1551 et seq., which, among other things, prohibits the false labeling of agricultural seed packages. The act requires that a seed producer label its products with the "name of the kind or kind and variety for each agricultural seed component in excess of 5 per centum of the whole." 7 U.S.C. § 1571(a)(2). At trial, HMSC senior sales representative Michael Hannah testified that HMSC guaranteed that its seeds were "true to type." Thomas J. Moore, HMSC's market seed quality manager, testified that the Federal Seed Act requires a seed producer to indicate on its labeling if more than five percent of the seeds in a particular lot are "off-type." Moore explained that a female-inbred tomato grown from a seed labeled as "Mountain Fresh" is off-type and is not, in fact, a Mountain Fresh tomato. Moore acknowledged that, because the second grow-out and the scientific hybridity tests indicated that more than five percent of the seeds in lot number 140382.021 were off-type seeds from female-inbred plants, the Federal Seed Act would have mandated different labeling for the seeds in that lot. However, Moore said that when HMSC sold the seeds at issue in this case, it had not performed the second grow-out or the scientific hybridity tests and it did not know that 14 percent of the seeds in the lot were off-type.
HMSC's affirmation to Clifton Seed Company that the seeds in lot number 140382.021 were Mountain Fresh tomato seeds was an express warranty. See Agricultural Servs. Ass'n, Inc. v. Ferry-Morse Seed Co., 551 F.2d 1057, 1064 (6th Cir.1977) (holding that distributor's and seller's labeling seed as "C/S okra" was an express warranty). See generally § 7-2-313(1)(a), Ala.Code 1975 (providing that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise"). It is undisputed that HMSC breached the express warranty it made to Clifton Seed Company that the seeds in lot number 140382.021 were "true to type." The issue presented on this appeal is whether the farmers were entitled to recover from HMSC as intended third-party beneficiaries to the dealer agreement on their breach-of-contract *922 claim premised on the "true to type" express warranty in the dealer agreement.
A warranty, whether express or implied, is made by a seller to its buyer. See §§ 7-2-313, -314, and -315, Ala.Code 1975. HMSC was not the farmers' immediate seller and the farmers were, therefore, not in vertical privity with HMSC.[3] However, "[i]n an appropriate case, . . . straightforward traditional third party beneficiary analysis can be successfully used to impose liability on a warrantor not in privity with a purchaser." 13 Richard A. Lord, Williston on Contracts § 37:39 at 259-60 (4th ed.2000)(footnote omitted). "There are many recurring situations where representations made only to an immediate buyer are made for the benefit of a downstream buyer. . . . At this point, there is space for the importation of third party beneficiary law." Gary L. Monserud, Blending the Law of Sales with the Common Law of Third Party Beneficiaries, 39 Duq. L.Rev. 111, 137 (Fall 2000). Section 7-2-313, Ala. Code 1975, a part of Alabama's version of the Uniform Commercial Code ("the UCC"), deals with express warranties. Part 2 of the Official Comment to that section explains:
"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. . . . [T]he matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise."
Although third-party-beneficiary analysis may allow a vertical nonprivity plaintiff to recover based on a remote seller's warranty, some courts have held that "the obligations [of a warrantor] . . . are not conceived of as third party obligations, but rather as direct obligations running from the warranting seller to the complainant downstream. In these cases, common law third party beneficiary theory has played no role extending the coverage of Section 2-313." Monserud, 39 Duq. L.Rev. at 136.
In Alabama, a vertical nonprivity purchaser who has suffered only direct or consequential economic loss cannot recover from a remote manufacturer under an implied warranty theory. See, e.g., Rampey v. Novartis Consumer Health, Inc., 867 So.2d 1079 (Ala.2003); Ex parte General Motors Corp., 769 So.2d 903 (Ala.1999); Bryant v. Southern Energy Homes, Inc., 682 So.2d 3 (Ala.1996); Rhodes v. General Motors Corp., 621 So.2d 945 (Ala.1993); Wellcraft Marine v. Zarzour, 577 So.2d 414 (Ala.1990); and State Farm Fire & Cas. Co. v. J.B. Plastics, Inc., 505 So.2d 1223 (Ala.1987). However, "`privity rules have been applied less restrictively to express as opposed to implied warranties.'" Monserud, 39 Duq. L.Rev. at 135-36 (quoting 1 William D. Hawkland, Uniform Commercial Code Series § 2-313:9 at 578 (2001)).
*923 Alabama courts have not had the opportunity to decide whether a vertical nonprivity purchaser who has suffered only economic loss can recover from a remote seller or manufacturer under a theory that the purchaser is a third-party-beneficiary of a contract containing the manufacturer's express warranty to a dealer or an intermediate seller. In a recent case, however, the Alabama Supreme Court indicated that a vertical nonprivity purchaser might be able to recover against a manufacturer under just such a theory. See Bay Lines, Inc. v. Stoughton Trailers, Inc., 838 So.2d 1013 (Ala.2002).
In Bay Lines, Crane, a manufacturer of fiberglass-reinforced side panels for use on truck trailers, warranted to Stoughton, a manufacturer of truck trailers, that the fiberglass reinforcement on the panels would not "delaminate" during a period of 10 years of normal use. The warranty was "`limited to the original equipment purchaser.'" 838 So.2d at 1016. Bay Lines, a trucking company that bought trailers from a dealer who sold trailers built by Stoughton, sued Stoughton and Crane when the fiberglass panels on the trailers it purchased delaminated. Bay Lines alleged an AEMLD claim; claims of negligence and wantonness in manufacturing and assembling the trailers; breach of an express warranty; and breach of contract, contending that it was a third-party beneficiary of the contract containing the warranty given by Crane to Stoughton. The trial court entered a judgment on the pleadings in favor of Stoughton, pursuant to Rule 12(c), Ala. R. Civ. P., and dismissed the claims against Crane pursuant to Rule 12(b)(6), Ala. R. Civ. P. Bay Lines appealed.
The Alabama Supreme Court affirmed, holding that Bay Lines could not assert a claim on the warranty because the warranty was clearly limited to Stoughton as the first purchaser from Crane. With respect to the third-party-beneficiary claim, the court held:
"Bay Lines presented no evidence indicating that Crane knew, when it sold the panels to Stoughton, that Bay Lines was a purchaser of Stoughton's products, or that Crane intended to protect future customers of Stoughton, such as Bay Lines, when it warranted its products to Stoughton. Bay Lines, therefore, cannot rely on the warranty to support its [third-party-beneficiary] claim against Crane."
838 So.2d at 1018-19 (emphasis added).
In the present case, there was substantial evidence indicating that HMSC did intend to protect future customers of Clifton Seed Company and other users when it warranted its products to Clifton Seed Company. The farmers elicited testimony from HMSC senior sales representative Michael Hannah that HMSC was aware that, if the seeds it produced and sold to Clifton Seed Company were defective, then end users like the farmers in this case would suffer significant financial losses. "Foreseeability [alone], however, does not confer [third-party] beneficiary status." See In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 21 F.Supp.2d 593, 600 (E.D.La.1998)(rejecting homeowners' argument  that they were third-party beneficiaries of a contract between exterior-hardboard-siding manufacturer and suppliers from whom builder purchased siding  "because it was foreseeable  indeed, inevitable  that the siding would be in the homeowners' possession after it [was] installed"). Nevertheless, foreseeability of harm to end users is a factor bearing on the question whether the contracting parties intended to benefit third parties like the farmers when they executed their dealer agreement. That agreement employed the terms "end user," "customer," *924 and "buyer or user" at several places. For example:
"Dealer will act as an independent contractor and use its best efforts to promote and sell HMSC products to end users within the Territory."
"Seeds at times carry seed-borne diseases which may not be apparent to the Seller, Buyer or User. All risks of nonperformance, reduced performance and/or crop damage due to these factors shall be assumed by the buyer and user."
"BUYER'S AND USER'S EXCLUSIVE REMEDY AND [HMSC's] SOLE LIABILITY FOR LOSS OR DAMAGE ARISING FROM PURCHASE OR USE OF [HMSC] . . . SEEDS SHALL BE AN AMOUNT EQUAL TO THE PRICE PAID FOR THE SEEDS USED."
"LIMITATION OF LIABILITY

"BUYER OR USER MAY NOT RECOVER ANY AMOUNT FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFIT, LOSS OF YIELD AND AMOUNTS EXPENDED IN USING OR GROWING SUCH SEEDS, OR FOR HARVESTING THE PRODUCE OF SUCH SEEDS. THIS LIMITATION OF LIABILITY SHALL BE APPLICABLE TO ANY CLAIM PRESENTED TO [HMSC] WHETHER THE LEGAL THEORY FORMING THE BASIS OF SUCH CLAIM INVOLVES CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE. Buyer and user agree that if [HMSC] refunds an amount equal to the price Buyer or User paid for [HMSC] . . . seeds, this limitation of liability will not have failed in its essential purpose."
"ENTIRE AGREEMENT

"This Limitation of Warranty and Liability is the entire agreement between Harris Moran Seed Company and Buyer or User. Buyer and User agree that they are not relying on any statement, agreement, writing, warranty or representation, whether written or oral, other than those contained in the Limitation of Warranty and Liability."
(Capitalization in original; emphasis added.)
Other sections of the agreement required Clifton Seed Company to "resell the Products in compliance with all applicable labeling laws" and to "give . . . buyers and other transferees explicit and specific notice, prior to the sale or transfer, of the HMSC Limitation of Warranty and Liability." The farmers contend that the terms of the dealer agreement contemplated the existence of end users like them and indicated that HMSC intended to benefit them when it warranted the seeds it sold to Clifton Seed Company. Compare Zeigler v. Blount Bros. Constr. Co., 364 So.2d 1163, 1166 (Ala.1978)(noting that the contract did not mention third parties), with Locke v. Ozark City Bd. of Educ., 910 So.2d 1247, 1253 (Ala.2005) (concluding that the agreement of the contracting parties anticipated the existence of third parties), and H.R.H. Metals, Inc. v. Miller, 833 So.2d 18, 25 (Ala.2002) (same).
In the present case, we conclude that HMSC and Clifton Seed Company, the contracting parties, not only had end users like the farmers in mind when they reached their agreement, but also specifically provided for those end users to be notified of HMSC's "exclusive express warranty" that the seeds were "true to type." See Allis-Chalmers Mfg. Co. v. *925 Coplin, 445 S.W.2d 627 (Tex.Civ.App. 1969), disapproved on other grounds, Ford Motor Co. v. Miles, 967 S.W.2d 377 (Tex. 1998) (stating that when manufacturer specifically required that a form containing its product warranty be used by dealer in connection with sale to customer, that requirement manifested an intent that the manufacturer's express warranty ran directly to the customer).
A further manifestation of HMSC's intent to protect and benefit the end users of its products is found in the reference to "federal law" and "federal seed law" in its warranty. Those phrases obviously refer to the Federal Seed Act, which, as we have previously discussed, prohibits false labeling of agricultural seed packages. The act is "meant to protect . . . buyers . . . and . . . consumers . . . against purchasing the wrong seed." Agricultural Servs. Ass'n., Inc. v. Ferry-Morse Seed Co., 551 F.2d at 1068. Cf. Swann v. Hunter, 630 So.2d 374, 377 (Ala.1993) (concluding that plaintiffs presented substantial evidence of third-party-beneficiary status and noting that "the state and local regulations, in accordance with which [the residential developer] had to obtain approval of the subdivision, were promulgated for the protection and benefit of . . . those members of the public purchasing real property for residential purposes).
We conclude that there was substantial evidence indicating that when HMSC sold and warranted the seeds to Clifton Seed Company it intended to benefit future customers of Clifton Seed Company and other end users like the farmers in this case. The trial court did not err in submitting to the jury the breach-of-contract claim premised on the "true to type" express warranty based on a third-party-beneficiary theory.

The One-Year Contractual Time-to-Sue Limitation
HMSC did not raise, by its answer or by motion, the defense that the farmers' complaint was barred by the one-year limitations period for filing suit that appears in its dealer agreement with Clifton Seed Company. A contractual time-to-sue limitation is akin to a statutory limitations period; therefore, it is an affirmative defense that is waived if not raised in a responsive pleading or by a motion. See Rule 8(c), Ala. R. Civ. P. See also Johnson v. Life Ins. Co. of Alabama, 581 So.2d 438 (Ala.1991); and Ex parte Neely Truck Line, Inc., 588 So.2d 484 (Ala.Civ.App. 1991). Accordingly, HMSC has waived this issue on appeal. See MacWillie v. Southeast Alabama Gas Dist., 539 So.2d 245, 247 (Ala.1989) (stating that "[t]he [appellee] failed to allege anywhere in its answer, its motion to dismiss, or its motion for summary judgment that the [appellants'] . . . action was barred by the statute of limitations. Since the statute of limitations defense appears nowhere in the record below, it is not before this Court on appeal.").

The Jury Instruction on Compensatory Damages
HMSC argues that, assuming it is liable to the farmers on a breach-of-contract claim, the farmers' damages are limited, by the terms of the dealer agreement between HMSC and Clifton Seed Company, to the return of the purchase price of the seeds. The applicable portions of the dealer agreement state:
"EXCLUSIVE REMEDY

"BUYER'S AND USER'S EXCLUSIVE REMEDY AND [HMSC's] SOLE LIABILITY FOR LOSS OR DAMAGE ARISING FROM PURCHASE OR USE OF [HMSC] . . . SEEDS SHALL BE AN AMOUNT EQUAL TO THE *926 PRICE PAID FOR THE SEEDS USED."
"LIMITATION OF LIABILITY

"BUYER OR USER MAY NOT RECOVER ANY AMOUNT FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFIT, LOSS OF YIELD AND AMOUNTS EXPENDED IN USING OR GROWING SUCH SEEDS, OR FOR HARVESTING THE PRODUCE OF SUCH SEEDS. THIS LIMITATION OF LIABILITY SHALL BE APPLICABLE TO ANY CLAIM PRESENTED TO [HMSC] WHETHER THE LEGAL THEORY FORMING THE BASIS OF SUCH CLAIM INVOLVES CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE. Buyer and user agree that if [HMSC] refunds an amount equal to the price Buyer or User paid for [HMSC] . . . seeds, this limitation of liability will not have failed in its essential purpose."
Over HMSC's objection, the trial court charged the jury as follows:
"Damages for the breach of contract is that sum of money which would place the plaintiff in the same condition he would have occupied if the contract had not been breached. Now that is a simple explanation of it.
"As applied to growing crops the measure of damages for damage to growing crops is the difference between the fair and reasonable market value of the crop actually raised and gathered on the land in the year 1999 and the fair and reasonable market value of the crops that would have been raised on those lands in that year considering the way the crops were worked, the weather, insects, plant disease, fertilizer and all of those other factors, had the crop not been damaged by the breach of contract, less the reasonable cost of gathering, housing and marketing that part of the crop that was damaged. Thus, the measure of damages is the difference in yield, what the yield would have been had the crop not been damaged after considering all such factors and the actual yield, less the reasonable cost of gathering, housing and marketing that portion of the crop which was lost as a proximate result of the breach."
Citing Mullis v. Speight Seed Farms, Inc., 234 Ga.App. 27, 505 S.E.2d 818 (1998), the farmers argue that the limitation-of-remedies provision restricting buyers to the return of the purchase price of the product is unconscionable in crop-loss cases. In Mullis, a commercial tobacco farmer sued a seed manufacturer alleging that the seeds he purchased were defective and caused him economic losses in excess of $15,000. The manufacturer moved for a summary judgment, arguing that if it was liable for a breach of warranty, the farmer could recover only the purchase price of the seeds under the limitation-of-remedies provision of its warranty disclaimer. The farmer contended that the limitation-of-remedies provision was unconscionable. Noting that the issue was one of first impression in Georgia, the Georgia Court of Appeals stated:
"Our review of this area of law in other jurisdictions revealed a substantial number of cases wherein warranty disclaimers and limitation of remedy provisions were found to be unconscionable in similar factual settings such as the purchase of seeds for crops or pesticides to control weeds on crops grown for commercial purposes. See Lutz Farms v. Asgrow Seed Co., 948 F.2d 638 (10th Cir.1991) (limitation of remedies provision on onion seed labels and invoice was unconscionable as it failed of its essential *927 purpose); Martin v. Joseph Harris Co., [767 F.2d 296 (6th Cir.1985)] (disclaimer of warranty and limitation of remedy clause used by cabbage seed producer were unconscionable under Michigan law due to unequal bargaining position between farmer and seed producer, existence of latent defect in seed, and seed producer's knowledge of potential defect); Schmaltz v. Nissen, [431 N.W.2d 657 (S.D.1988)](disclaimer of warranty and limitation of remedy used by sorghum seed manufacturer were unconscionable as they left farmer without substantial redress for loss); Hanson v. Funk Seeds Intl., [373 N.W.2d 30 (S.D. 1985)] (court found warranty disclaimer and limitation of remedy provision unconscionable in action by farmer against seed corn supplier because farmer not in position to bargain or able to test seed and enforcement of such provisions would leave farmer without a remedy); Durham v. Ciba-Geigy Corp., 315 N.W.2d 696 (S.D.1982) (court determined that disclaimer of warranty and limitation of consequential damages found on pesticide's pre-printed label were unconscionable and contrary to public policy as they left consumer without substantial recourse for loss); Mallory v. Conida Warehouses, 134 Mich. App. 28, 350 N.W.2d 825 (Mich.App. 1984) (court found limitation of remedy to purchase price of red kidney bean seed was unconscionable). Compare Jones v. Asgrow Seed Co., 749 F.Supp. 836 (N.D.Ohio 1990) (limitation of liability not unconscionable where limitation was conspicuous, buyer was experienced commercial tomato seed buyer, not an ordinary consumer, and seed contained undiscoverable latent defect); Nunes Turfgrass v. Vaughan-Jacklin Seed Co., 200 Cal.App.3d 1518, 246 Cal.Rptr. 823 (1988) (seller's limitation of consequential damages clause in sales confirmation for sale of commercial sod seed mix was not unconscionable where both buyer and seller were large commercial entities familiar with sod seed business and had done business together for 20 years). But see A & M Produce Co. v. FMC Corp., [135 Cal.App.3d 473, 186 Cal.Rptr. 114 (1982)] (disclaimer of warranties and exclusion of consequential damages contained in form contract selling farming equipment were unconscionable)."
Mullis, 234 Ga.App. at 31, 505 S.E.2d at 821-22. Holding that the limitation-of-remedies provision was unconscionable, the Georgia court concluded:
"[C]onsidering the substantive element of unconscionability, it is apparent that the allocation of risk for ineffective seeds is better shouldered by the manufacturer of the seed, rather than the consumer. The consumer does not have the ability or resources to test the seed prior to its use; however, the manufacturer does. Furthermore, the farmer is required to expend large sums of money before any defect in the seed is noticeable, and once a defect is found an entire year's crop might be worthless. Once the crop has failed, the farmer's only recourse is monetary compensation to cover his lost profit and expenditures; replacement and repair are not viable options. The manufacturer is also in a better position to allocate the cost of testing among all consumers of its product."
Mullis, 234 Ga.App. at 30-31, 505 S.E.2d at 821.
We must reject the holding Mullis because our own supreme court has reached the opposite result in Fleming Farms v. Dixie Ag Supply, Inc., 631 So.2d 922 (Ala.1994), and Southland Farms, Inc. v. Ciba-Geigy Corp., 575 So 2d 1077 (Ala. 1991). Although neither of those decisions *928 involved defective seeds, each dealt with a product that, when applied to a commercial farmer's crops, allegedly reduced the farmer's crop yield. In Fleming Farms, the product was a "safener" designed to reduce the injury to cotton that occurs from the use of herbicides; in Southland Farms, the product was a chemical designed to prevent nut grass and potato rot. In each case, the product was sold with a warranty disclaimer and a limitation-of-remedies clause excluding consequential damages. In each case, the Alabama Supreme Court determined that the exclusion of consequential damages for a commercial loss was not unconscionable. The Alabama Supreme Court explained its reasoning in Southland Farms:
"The Uniform Commercial Code recognizes the validity of a limitation or exclusion of consequential damages where the loss is commercial. Ala.Code 1975, § 7-2-719(3), reads as follows:
"`(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.' (Emphasis added.)
"This Court has confirmed the validity of risk-shifting provisions in the commercial context in Kennedy Electric Co. v. Moore-Handley, Inc., 437 So.2d 76 (Ala.1983), and in Puckett, Taul & Underwood v. Schreiber Corp., 551 So.2d 979 (Ala.1989).
"We stated in Puckett, Taul & Underwood:

"`Commercial parties may contract freely to limit the remedies available to them. An agreement between parties in a commercial transaction "may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts. . . ." Code 1975, § 7-2-719(1)(a). Thus, the clear public policy in Alabama is to allow a seller to limit the remedies available to a buyer.'
"551 So.2d at 983.
"Where a provision excluding consequential damages is so widely used and accepted in a particular trade that it can be characterized as a `usage of trade,' it has been found to be reasonable. Comment 6 to § 7-1-205 makes it clear that a contract clause resting on `usage of trade,' while not immune from a charge of unconscionability, is prima facie `reasonable' due to its broad-based commercial acceptance:
"`6. The policy of this Act controlling explicit unconscionable contracts and clauses (Sections 7-1-203, 7-2-302) applies to implicit clauses which rest on usage of trade and carries forward the policy underlying the ancient requirement that a custom or usage must be "reasonable." However, the emphasis is shifted. The very fact of commercial acceptance makes out a prima face case that the usage is reasonable, and the burden is no longer on the usage to establish itself as being reasonable. But the anciently established policing of usage by the courts is continued to the extent necessary to cope with the situation arising if an unconscionable or dishonest practice should become standard.'
"Agricultural chemicals are sold, on an industry-wide basis, subject to an exclusion of liability for consequential *929 damages. The affidavit of Dr. Everett Cowett, director of technical services for the Agricultural Division of Ciba-Geigy, has attached to it sample labels from 18 different pesticide manufacturers, all containing clauses excluding consequential damages. Clauses excluding consequential damages are permitted under the U.C.C. because they are an allocation of unknown or undeterminable risks. Comment 3, § 7-2-719.
"The Minnesota Supreme Court found an identical section of a Ciba-Geigy exclusionary clause to be reasonable in Kleven v. Geigy Agricultural Chemicals, 303 Minn. 320, 227 N.W.2d 566 (1975). That court concluded that the facts of nature and the nature of the product made the stated exclusion of consequential damages reasonable. The court reasoned as follows:
"`It is general knowledge, as the trial court in that rural area noted, that the eventual yield of a farm crop, such as corn, is affected by numerous and varied factors such as soil, weather, seed, weeds and other conditions. Considering the nature of the product itself and the multitude of conditions and factors that affect its effectiveness or its degree of effectiveness, limited favorable results could be anticipated. Finally, it is clear that the risks of failure were fairly disclosed to the plaintiffs at the time of purchase in these words:
"`" . . . Crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions, presence of other materials, or the manner of use or application all of which are beyond the control of Geigy or the Seller. All such risks shall be assumed by the Buyer."'
"303 Minn. at 326, 227 N.W.2d at 572. In accord, Earl Brace & Sons v. Ciba-Geigy Corp., 708 F.Supp. 708 (W.D.Pa. 1989); Slemmons v. Ciba-Geigy Corp., 57 Ohio App.2d 43, 385 N.E.2d 298 (1978).
"In upholding the exclusion clause in Lindemann v. Eli Lilly & Co., 816 F.2d 199 (5th Cir.1987), the Fifth Circuit Court of Appeals noted the commercial context of transactions of this nature. The court noted that the purchaser was an experienced and sophisticated farmer who operated a large holding and had been using the product for years. The court saw these facts as establishing a course of dealing between the parties. These factors, the court felt, indicated that no procedural unconscionability existed. The court further found no substantive unconscionability, stating that `the principle of unconscionability is one of preventing oppression and unfair surprise, not the disturbance of allocation of risks because of superior bargaining power.' 816 F.2d at 204. The court discussed the fulfilling of the risk-allocation function by such exclusion clauses as that in Lindemann, as follows:
"`The decision of a herbicide manufacturer to limit damages would seem, in the absence of other evidence, abundantly to fulfill this risk-allocation function, because the uncertainties inherent in the agricultural business are legion, and many of them, such as planting, cultivating, harvesting and marketing decisions, are uniquely within the control of the farmer  the . . . customer.'
"816 F.2d at 204.
"As these cases demonstrate, a consequential damages exclusion in the commercial context of the sale of agricultural chemicals is an accepted method of risk-shifting in the industry.1 Indeed, *930 Southland Farms admits in its brief (p. 16) that the disclaimers on the labels of the . . . products involved here have been upheld in other jurisdictions and that those jurisdictions have held that consequential and incidental damages were not recoverable.2 There are several reasons that make these clauses an accepted usage of trade: (1) the vagaries of nature and the nature of such products; (2) the fact that the numerous factors affecting crop yield are beyond the manufacturer's control; (3) the fact that if the potential for consequential losses were shifted to the seller, the cost of the product would be prohibitive; and (4) the fact that crop insurance is available to the farmer to mitigate any burdensome effect that such an exclusion would have.
"1The Supreme Court of South Dakota found a disclaimer identical to the one in this case to be unconscionable. Durham v. Ciba-Geigy Corp., 315 N.W.2d 696 (S.D.1982). However, after Durham was decided, the South Dakota legislature enacted a statute that negated its holding.
"2Citing: Kleven v. Geigy Agricultural Chemicals, 303 Minn. 320, 227 N.W.2d 566, at 572 (1975); Earl Brace & Sons v. Ciba-Geigy Corp., 708 F.Supp. 708 (W.D.Pa.1989); Slemmons v. Ciba-Geigy Corp., 57 Ohio App.2d 43, 385 N.E.2d 298 (1978)."
Southland Farms, 575 So.2d at 1079-81.
Although, as previously mentioned, neither Southland Farms nor Fleming Farms dealt with a contractual limitation-of-remedies provision in a defective-seed case, a recent decision of the United States District Court for the Middle District of Alabama, applying Alabama law, held that a seed seller's exclusion of consequential damages was not unconscionable. See Moorer v. Hartz Seed Co., 120 F.Supp.2d 1283 (M.D.Ala.2000). In that case, Moorer Seed Company ("MSC"), a sole proprietorship, sued Hartz Seed Company, alleging, among other claims, that Hartz Seed Company had breached its express warranty that the soybean seeds it sold to MSC were "`certified quality or better.'" 120 F.Supp. at 1287. Hartz Seed Company contended that its potential liability on that claim was limited to the purchase price of the seeds under a limitation-of-remedies provision substantially identical to the one at issue in the instant appeal. Chief Judge Albritton concluded, "in light of the plain language of the U.C.C. and the Southland Farms decision, that the limitation of remedies clause . . . [was] not unconscionable." 120 F.Supp. at 1296. Judge Albritton continued:
"The factors listed in Southland Farms inform this court's decision. There is much more to the growth of a successful soybean crop than germination rates. If the Defendants were potentially liable for all consequential damages arising from crop failure, the cost of their products would be prohibitively expensive. Finally, means are available for buyers to mitigate any burdensome effects that a limitation of remedies provision might have."
Moorer v. Hartz Seed Co., 120 F.Supp.2d at 1297.
The trial court erred in its charge to the jury as to the measure of damages in this case. See, generally, Holly v. Hunstville Hosp., 865 So.2d 1177, 1187-88 (Ala.2003) (stating that a party is entitled to proper jury instructions, that a court reviews the entire jury charge to determine if the court has committed reversible error, and that reversal is warranted only if the error is prejudicial). As a third-party beneficiary of the contract between HMSC and Clifton Seed Company, *931 the farmers step into Clifton Seed Company's shoes for purposes of the consequential-damages exclusion. See Georgia Power Co. v. Partin, 727 So.2d 2, 5 (Ala.1998):
"It is a well-established principle of Alabama law that a contract made for the benefit of a third person may, at his election, be accepted and enforced by him. Michie v. Bradshaw, 227 Ala. 302, 149 So. 809 (1933). However, `[i]f he claims the benefits [of the contract], he also assumes the burdens.' Michie, 227 Ala. at 308, 149 So. at 814. See, also, Ex parte Dyess, 709 So.2d 447 (Ala.1997) (nonsignatory plaintiff claiming the benefit of a contract as a third-party beneficiary is subject to arbitration agreement within that contract). `The law is clear that a third party beneficiary is bound by the terms and conditions of the contract that it attempts to invoke. "The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract."' Interpool Ltd. v. Through Transport Mut. Ins. Ass'n Ltd., 635 F.Supp. 1503, 1505 (S.D.Fla.1985), quoting Trans-Bay Engineers & Builders, Inc. v. Hills, 551 F.2d 370, 378 (D.C.Cir. 1976). See, also, Dunn Constr. Co. v. Sugar Beach Condominium Ass'n, Inc., 760 F.Supp. 1479 (S.D.Ala.1991); Lee v. Grandcor Medical Systems, Inc., 702 F.Supp. 252, 255 (D.Colo.1988) (`A third party beneficiary must accept a contract's burdens along with its benefits.')."
Because we reverse the judgment on this basis, we need not address whether the trial court's failure to hold a hearing on HMSC's postjudgment motion directed to this issue was error. See Hall v. Hall, 895 So.2d 299, 305 (Ala.Civ.App.2004).

The Farmers' Arguments on the Cross-Appeal
The trial court entered a JML in favor of HMSC on the farmers' AEMLD claim as well as on the farmers' claims alleging fraudulent suppression, negligence, and wantonness. The trial court based its ruling on the "economic-loss rule," which has been stated as follows:
"Under [the economic-loss] rule, a cause of action does not arise under tort theories of negligence, wantonness, strict liability, or the AEMLD where a product malfunctions or is defective and thereby causes damage only to the product itself. See Wellcraft Marine, a Div. of Genmar Industries, Inc. v. Zarzour, 577 So.2d 414 (Ala.1990); Dairyland Ins. Co. v. General Motors Corp., 549 So.2d 44 (Ala. 1989); and Lloyd Wood Coal Co. v. Clark Equip. Co., 543 So.2d 671 (Ala. 1989)."
Ford Motor Co. v. Rice, 726 So.2d 626, 631 (Ala.1998). In adopting the economic-loss rule, our supreme court in Lloyd Wood Coal v. Clark Equipment Co., 543 So.2d 671 (Ala.1989), quoted from the decision of the United States Supreme Court in East River Steamship Corporation v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986):
"`[W]e . . . hold that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.
"`"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the `luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." Seely v. White Motor Co., 63 Cal.2d [9], at 18, 45 Cal. Rptr. [17], at 23, 403 P.2d [145], at 151 *932 [(1965)]. When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.
"`The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. Escola v. Coca-Cola Bottling Co., 24 Cal.2d [453], at 462, 150 P.2d [436], at 441 [(1944)] (concurring opinion). In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured. See 10A Couch on Insurance §§ 42:385-42:401, 42:414-17 (2nd ed.1982); 7 Benedict on Admiralty, Form No. 1.16.7 (7th ed.1985); 5A Appleman, Insurance Law and Practice § 3252 (1970). Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified. Cf. United States v. Carroll Towing Co., 159 F.2d 169, 173 (C.A.2 1947).
"`Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value." See J. White and R. Summers, Uniform Commercial Code 406 (2d ed.1980). The maintenance of product value and quality is precisely the purpose of express and implied warranties. See UCC § 2-314 (implied warranty of merchantability), and § 2-315 (warranty of fitness for a particular purpose). Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract. See UCC §§ 2-601, 2-608, 2-612.' Id., 476 U.S. at 871-72, 106 S.Ct. at 2302-03. (Citations omitted.) (Emphasis added.)
"A commentator has concisely stated the Court's holding:
"`First, consequential economic loss caused by the failure of a product is more insurable by buyers than loss caused by personal injury; therefore, the increased cost of the product would not be justified. Second, parties should be free to allocate risks among themselves without the intrusion of tort liability. Third, warranty law contains an adequate remedy with necessary limitations on liability, that is, privity and remoteness, while liability in tort could subject manufacturers to damages in an indefinite amount.' (Footnotes omitted.)
"Recovery of Pure Economic Loss in Product Liability Actions: An Economic Comparison of Three Legal Rules,' 11 U. of Puget Sound L.Rev. 283, 293 (1987)."
Lloyd Wood Coal Co., 543 So.2d at 673-74.
The farmers argue that the rationale of Lloyd Wood Coal Co. and East River Steamship should not apply here because, they say, the defective product in this case did not "injure itself." Instead, the farmers characterize the situation as follows: the purchased product (seeds) was used to produce another product (tomatoes), with the injury affecting not the *933 purchased product but the resulting product. At least one court has decided otherwise. See Martin Rispens & Son v. Hall Farms, Inc., 621 N.E.2d 1078 (Ind.1993), abrogated by Hyundai Motor America, Inc. v. Goodin, 822 N.E.2d 947 (Ind.2005)(acknowledging the existence of the "economic-loss rule" under prior law, but abolishing vertical privity in actions against a manufacturer for breach of implied warranty). In Martin Rispens, a significant portion of the plaintiff's watermelon crop was ruined by a disease traced to defective seeds purchased from the defendant. The court concluded that the plaintiff's claim was based on damage to the product itself  melons grown from the purchased seeds  and governed by the "economic loss rule."
We conclude that the trial court did not err by entering a JML for HMSC on the farmers' tort claims.

Conclusion
The judgment entered on the jury's verdict is affirmed with respect to HMSC's liability for breach of contract. The judgment is reversed insofar as it awards the farmers damages in the amount of $55,000. The cause is remanded with instructions to enter an award of damages consistent with the limitation-of-remedies provision found in the contract upon which the farmers relied for their third-party-beneficiary status. The trial court's entry of a JML as to the farmers' tort claims is affirmed.
APPEAL  AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CROSS-APPEAL  AFFIRMED.
PITTMAN, J., concurs.
THOMPSON, J., concurs in the result, with writing, which BRYAN, J., joins.
MURDOCK, J., dissents, without writing.
THOMPSON, Judge, concurring in the result.
This court is bound by the precedent set forth by our supreme court. § 12-3-16, Ala.Code 1975; Ex parte Jones, 288 Ala. 242, 244, 259 So.2d 288, 290 (1972) ("the Court of Civil Appeals is without authority to overrule the decisions of this court"); Farmers Ins. Exch. v. Raine, 905 So.2d 832, 835 (Ala.Civ.App.2004) ("Although the supreme court might choose to revisit this issue, this court is bound by precedent."); and C & S Constr. Co. v. Martin, 420 So.2d 788, 789 (Ala.Civ.App.1982) (this court may not overrule decisions of our supreme court). For that reason, I concur with the result the main opinion reaches with regard to HMSC's appeal as to the breach-of-contract claim, which is based on the precedent set forth by our supreme court. However, I find the rationale set forth in Mullis v. Speight Seed Farms, Inc., 234 Ga.App. 27, 505 S.E.2d 818 (1998), might lead to a more equitable result. In that case, the court stated:
"`It has been recognized that "unconscionability" as set forth in UCC § 2-302 is "not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." (Footnote and emphasis deleted.) Vol. 1, White & Summers, Uniform Commercial Code (4th ed.), p. 213, § 4-3. See also A & M Produce Co. v. FMC Corp., 135 Cal. App.3d 473, 186 Cal.Rptr. 114, 120 (App.1982) (unconscionability is "a flexible doctrine designed to allow courts to directly consider numerous factors which may adulterate the contractual process"). Foreign courts have generally divided the relevant factors into procedural and substantive elements. See UCC  Unconscionable Warranty Disclaimer, 38 *934 A.L.R.4th 25, §§ 2, 3(a)(b). Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves. Id.; White & Summers, supra. A non-inclusive list of some factors courts have considered in determining whether a contract is procedurally unconscionable includes the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice. See, e.g., Fotomat Corp. of Fla. v. Chanda, 464 So.2d 626, 629 (Fla.App. 5th Dist.1985); Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 549 P.2d 903, 906-907 (Kan.1976) (commercial transaction); Schroeder v. Fageol Motors, 86 Wash.2d 256, 544 P.2d 20, 23 (Wash.1975). See also White & Summers, supra, p. 215, § 4-3, fn. 15. As to the substantive element of unconscionability, courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns. See, e.g., Fotomat Corp. of Fla. v. Chanda, supra, 464 So.2d at 629; A & M Produce Co. v. FMC Corp., supra, 186 Cal.Rptr. at 122 (commercial transaction). See also White & Summers, supra, §§ 4-4 through 4-6.'
"NEC Technologies [v. Nelson], [267 Ga. 390,] 391-392, 478 S.E.2d 769 [(1996)].
"`The procedural element focuses on two factors: "oppression" and "surprise." "Oppression" arises from an inequality of bargaining power which results in no real negotiation and "an absence of meaningful choice." "Surprise" involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.'
"(Citations omitted.) A & M Produce Co. v. FMC Corp., supra, 186 Cal.Rptr. at 121-122.
"In the present case, Mullis is a farmer, not a professional seed merchant. Mullis purchased the seed over the telephone during a conversation in which only the seed variety and price were discussed. Speight's president deposed that Speight does not negotiate warranty terms with any customers. Mullis, `like most farmers, was not in a position to bargain for more favorable contract terms, nor was he able to test the seed before the purchase. A crop failure is inevitable if the [tobacco] seed is ineffective and to enforce the provisions here in question, which would only allow the return of the purchase price, would leave [Mullis] without any substantial recourse for his loss. In essence, [Mullis] would be left without a remedy for another's breach.' Hanson v. Funk Seeds Intl., 373 N.W.2d 30, 35 (S.D. 1985).
"With regard to the surprise factor, at the time the contract was made to purchase the seed over the telephone, Mullis was not made aware of the warranty disclaimer or the limitation of remedies provisions. Additionally, considering the substantive element of unconscionability, it is apparent that the allocation of risk for ineffective seeds is better shouldered by the manufacturer of the seed, rather than the consumer. The consumer does not have the ability or resources to test the seed prior to its use; however, the manufacturer does. Furthermore, the farmer is required to *935 expend large sums of money before any defect in the seed is noticeable, and once a defect is found an entire year's crop might be worthless. Once the crop has failed, the farmer's only recourse is monetary compensation to cover his lost profit and expenditures; replacement and repair are not viable options. The manufacturer is also in a better position to allocate the cost of testing among all consumers of its product.

"Our review of this area of law in other jurisdictions revealed a substantial number of cases wherein warranty disclaimers and limitation of remedy provisions were found to be unconscionable in similar factual settings such as the purchase of seeds for crops. . . . See Lutz Farms v. Asgrow Seed Co., 948 F.2d 638 (10th Cir.1991) (limitation of remedies provision on onion seed labels and invoice was unconscionable as it failed of its essential purpose); Martin v. Joseph Harris Co., [767 F.2d 296 (6th Cir.1985)] (disclaimer of warranty and limitation of remedy clause used by cabbage seed producer were unconscionable under Michigan law due to unequal bargaining position between farmer and seed producer, existence of latent defect in seed, and seed producer's knowledge of potential defect); Schmaltz v. Nissen, [431 N.W.2d 657 (S.D.1988)] (disclaimer of warranty and limitation of remedy used by sorghum seed manufacturer were unconscionable as they left farmer without substantial redress for loss); Hanson v. Funk Seeds Intl., supra (court found warranty disclaimer and limitation of remedy provision unconscionable in action by farmer against seed corn supplier because farmer not in position to bargain or able to test seed and enforcement of such provisions would leave farmer without a remedy); . . . Mallory v. Conida Warehouses, 134 Mich.App. 28, 350 N.W.2d 825 (Mich.App.1984) (court found limitation of remedy to purchase price of red kidney bean seed was unconscionable). Compare Jones v. Asgrow Seed Co., 749 F.Supp. 836 (N.D.Ohio 1990) (limitation of liability not unconscionable where limitation was conspicuous, buyer was experienced commercial tomato seed buyer, not an ordinary consumer, and seed contained undiscoverable latent defect); Nunes Turfgrass v. Vaughan-Jacklin Seed Co., 200 Cal.App.3d 1518, 246 Cal.Rptr. 823 (1988) (seller's limitation of consequential damages clause in sales confirmation for sale of commercial sod seed mix was not unconscionable where both buyer and seller were large commercial entities familiar with sod seed business and had done business together for 20 years). But see A & M Produce Co. v. FMC Corp., supra (disclaimer of warranties and exclusion of consequential damages contained in form contract selling farming equipment were unconscionable)."
Mullis v. Speight Seed Farms, Inc., 234 Ga.App. at 29-31, 505 S.E.2d at 820-22 (emphasis added).
BRYAN, J., concurs.
NOTES
[1] Haynes and Haynes Plant Farms moved to dismiss the claims against them based on the farmers' failure to bring the action within one year of the accrual of the alleged claims, pursuant to the contract between Haynes and Haynes Plant Farm and the farmers. The trial court granted that motion and dismissed the claims against Haynes and Haynes Plant Farm.
[2] The evidence indicated that the farmers' decision to grow Mountain Fresh tomatoes was not based on any direct statements, advertisements, brochures, or other media solicitations by HMSC.
[3] "Vertical privity raises the question: Who in the distributive chain, aside from the final seller, can be made a proper party defendant? White and Summers describe the vertical non-privity plaintiff as follows: `The "vertical" non-privity plaintiff is a buyer within the distributive chain who did not buy directly from the defendant. For example, a man who buys a lathe from the local hardware store and then later sues the manufacturer is a "vertical" non-privity plaintiff.'"

Gary L. Monserud, Blending the Law of Sales with the Common Law of Third Party Beneficiaries, 39 Duq. L.Rev. 111, 113 n. 8 (Fall 2000) (quoting 1 James J. White & Robert S. Summers, Uniform Commercial Code § 11-2 (4th ed.1995)).